# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

AMBER NICOLE LOMPE,

      Appellee,

v.

SUNRIDGE PARTNERS, LLC and
APARTMENT MANAGEMENT
CONSULTANTS, L.L.C.,

      Appellants.

Case No.    14-8082

---

## APPELLANTS' OPENING BRIEF

---

Appeal from the United States District Court for the District of Wyoming
The Honorable Alan B. Johnson
Case No. 2:12-cv-00088-ABJ

Amy F. Sorenson
Amber M. Mettler
Douglas P. Farr
SNELL & WILMER LLP
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101
Tel:  (801) 257-1900
Fax: (801) 257-1800
asorenson@swlaw.com
amettler@swlaw.com
dfarr@swlaw.com

Patrick J. Murphy
William, Porter, Day, & Neville, P.C.
159 North Wolcott
Suite 400
Casper, Wyoming 82601
Tel: (307) 265-0700
Fax: (307) 266-2306
pmurphy@wpdn.net

*Attorneys for Appellants Sunridge Partners, LLC,*
*and Apartment Management Consultants, L.L.C.*

## ORAL ARGUMENT IS REQUESTED

20353051

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for

Appellants states the following:

Sunridge Partners, LLC ("Sunridge") is a limited liability company,

organized under Utah law.  Sunridge has no parent company and no publicly-held

corporation owns 10% or more of its stock.

Apartment Management Consultants, L.L.C. ("AMC") is a limited liability

company, organized under Utah law.  AMC has no parent company and no

publicly-held corporation owns 10% or more of its stock.

Date: April 10, 2015


<u>/s/ Amy F. Sorenson</u>
*Attorney for Appellants*

20353051

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................v

PRIOR OR RELATED APPEALS ........................................................1

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUES............................................................2

STATEMENT OF THE CASE ..............................................................3

I.      NATURE OF THE CASE ...........................................................3

II.     STATEMENT OF THE FACTS ..................................................4

        A.      Sunridge Partners, LLC ...............................................4

        B.      Apartment Management Consultants, L.L.C. .................6

        C.      Local Practice Regarding Furnace Maintenance.................9

        D.      Plaintiff Moves In to Unit 436 .....................................9

        E.      The Accident .............................................................10

        F.      AMC Responds to the Accident....................................11

        G.      The Alleged Prior Incidents ........................................12

        H.      The Alleged "Cover Up".............................................13

III.    TRIAL PROCEEDINGS ..........................................................14

        A.      Phase I (Liability)......................................................14

                1.      The District Court's Punitive Damages Instructions...............15

                2.      The Jury's Liability Verdict ...............................16

        B.      Phase II (Amount of Punitive Damages) .....................17

                1.      Randle's Testimony About Sunridge's Cash Flow .................17

                2.      Randle's Testimony About AMC's Cash Flow....................18

                3.      Defendants' Rebuttal Testimony ...........................19

                4.      Plaintiff Asks the Jury to Punish Defendants for "Gambling" with "Hundreds of People's Lives."....................20

                5.      The Jury Awards a Combined $25.5 Million in Punitive Damages......................................................21

        C.      Defendants' Post-Trial Motion.......................................21

**TABLE OF CONTENTS**

**Page**

SUMMARY OF THE ARGUMENT ....................................................22

ARGUMENT .................................................................................26

I.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER
      OF LAW ON PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES. .......26

      A.    Plaintiff Failed to Prove by a Preponderance of the Evidence
            that Either Defendant Engaged in "Willful and Wanton
            Misconduct." .................................................................26

            1.    No Legally Sufficient Evidentiary Basis Exists to Assess
                  Punitive Damages Against Sunridge. .....................................28

            2.    No Legally Sufficient Evidentiary Basis Exists to Assess
                  Punitive Damages Against AMC.............................................32

      B.    Plaintiff Failed to Introduce Evidence of Defendants' "Net
            Worth." ..............................................................................36

II.   THE DISTRICT COURT'S INSTRUCTIONS TO THE JURY ON
      PUNITIVE DAMAGES WERE INADEQUATE AND
      PREJUDICIAL. ..........................................................................39

III.  DEFENDANTS ARE ENTITLED TO A NEW TRIAL OR
      REMITTITUR BECAUSE THE PUNITIVE DAMAGES AWARDS
      ARE EXCESSIVE.........................................................................42

IV.   THE PUNITIVE DAMAGES AWARDS ARE GROSSLY
      EXCESSIVE AND ARBITRARY UNDER THE FOURTEENTH
      AMENDMENT AND MUST BE REDUCED. ............................................44

      A.    Plaintiff's Accident Was Not the Result of Reprehensible
            Conduct. ............................................................................45

      B.    The Punitive Damages Awards Are Unconstitutionally
            Disproportionate and Unreasonable.................................................49

      C.    The Absence of Comparable Civil Penalties or Judgments
            Confirms that the Punitive Damages Awards Are
            Unconstitutionally Excessive. ..........................................................51

V.    THE PUNITIVE DAMAGES AWARDS VIOLATE DUE PROCESS
      BY PUNISHING PERSONS NOT BEFORE THE COURT AND
      BECAUSE THEY BEAR NO RELATIONSHIP TO THE
      ALLEGEDLY WRONGFUL CONDUCT.  ................................................54

## TABLE OF CONTENTS

**Page**

A.    Due Process Prohibits Punishment of Persons Not Before the Court. ........................................................................................55

B.    The Punitive Damages Awards Lack Any Connection to the Allegedly Wrongful Conduct. ...........................................................56

CONCLUSION ....................................................................................58

STATEMENT REGARDING ORAL ARGUMENT ...........................................59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

ATTACHMENTS

# TABLE OF AUTHORITIES

Page

**Federal Cases**

Alley v. Gubser Dev. Co.,
  785 F.2d 849 (10th Cir. 1986) ...............................................................33
Bach v. First Union Nat'l Bank,
  486 F.3d 150 (6th Cir. 2007) ...............................................................50
Bell v. Clackamas County,
  341 F.3d 858 (9th Cir. 2003) ........................................... 27, 30, 45, 51
BMW of N. Am., Inc. v. Gore,
  517 U.S. 559 (1996) ................................................... 45, 48, 49, 57
Boerner v. Brown & Williamson Tobacco Co.,
  394 F.3d 594 (8th Cir. 2005) ...............................................................50
Bridgeport Music, Inc. v. Justin Combs Publ'g,
  507 F.3d 470 (6th Cir. 2007) ...............................................................50
Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.,
  492 U.S. 257 (1989) ...............................................................42
Clark v. Chrysler Corp.,
  436 F.3d 594 (6th Cir. 2006) ........................................................ 48, 51
Cont'l Trend Res. Inc. v. OXY USA, Inc.,
  810 F. Supp. 1520 (W.D. Oka. 1992), ...................................... 52, 56
Cont'l Trend Res., Inc. v. OXY USA, Inc.,
  101 F.3d 634 (10th Cir. 1996) ...............................................................58
Designs v. L'Oréal, S.A.,
  979 F.2d 499 (7th Cir. 1992) ...............................................................41
Exxon Shipping Co. v. Baker,
  554 U.S. 471 (2008) ........................................................ 25, 49
Jones v. United Parcel Service, Inc.,
  674 F.3d 1187 (10th Cir. 2012) ............................... 26, 27, 39, 44, 45, 49, 51, 54
Level 3 Commc'ns, LLC v. Liebert Corp.,
  535 F.3d 1146 (10th Cir. 2008) ...............................................................41
Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.,
  703 F.2d 1152 (10th Cir. 1981) ...............................................................44
Mason v. Texaco, Inc.,
  948 F.2d 1546 (10th Cir. 1991) ...............................................................26
McFadden v. Sanchez,
  710 F.2d 907 (2nd Cir. 1983) ...............................................................27

v

# TABLE OF AUTHORITIES

**Page**

Payne v. Jones,
  711 F.3d 85 (2d Cir. 2012) ...................................................................47
Philip Morris USA v. Williams,
  549 U.S. 346 (2007) .................................................................... 55, 56
Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists,
  422 F.3d 949 (9th Cir. 2005) ..............................................................51
State Farm Mut. Auto. Ins. Co. v. Campbell,
  538 U.S. 408 (2003) ................................................ 25, 46, 49, 51, 56
Vasbinder v. Scott,
  976 F.2d 118 (2d Cir. 1992) ...............................................................43
Williams v. ConAgra Poultry Co.,
  378 F.3d 790 (8th Cir. 2004) ....................................................... 46, 50
Zazú Designs v. L'Oréal, S.A.,
  979 F.2d 499, 508 (7th cir. 1992) ......................................................38

**State Cases**
Adel v. Parkhurst,
  681 P.2d 886 (Wyo. 1984) ..................................................................37
Albert H. Wohlers & Co. v. Bartgis,
  969 P.2d 949 (Nev. 1998) ...................................................................43
Banks v. Crowner,
  694 P.2d 101 (Wyo. 1985) ..................................................................41
Barragan v. Banco BCH,
  188 Cal. App. 3d 283 (1986) ..............................................................43
Cates v. Eddy,
  669 P.2d 912 (Wyo. 1983) ......................................................... 42, 44, 45
Cramer v. Powder River Coal, LLC,
  204 P.3d 974 (Wyo. 2009) .......................................... 23, 27, 29, 34
Farmers Ins. Exch. v. Shirley,
  958 P.2d 1040 (Wyo. 1998) ........................................ 24, 40, 42, 57
Hansuld v. Lariat Diesel Corp.,
  Case No. 85515, 2014 WL 2931248 (Wyo. Dist. Ct. Order Feb. 10, 2014)........38
Hashimoto v. Marathon Pipe Line Co.,
  767 P.2d 158 (Wyo. 1989) ..................................................................41
Jonathan Woodner Co. v. Breeden,
  665 A.2d 929 (D.C. 1995) ...................................................................37
Killough v. Jahandarfard,
  578 So. 2d 1041 (Ala. 1991) ...............................................................53

# TABLE OF AUTHORITIES

**Page**

Kilmer v. Browning,
  806 S.W.2d 75 (Mo. Ct. App. 1991) ....................................................53
Krier v. Safeway Stores 46, Inc.,
  943 P.2d 405 (Wyo. 1997) ................................................................34
Rosty v. Skaj,
  272 P.3d 947 (Wyo. 2012) ................................................... 23, 37, 38
Sears, Roebuck & Co. v. Harris,
  630 So. 2d 1018 (Ala. 1993) ............................................................53
Stephenson v. Pac. Power & Light Co.,
  779 P.2d 1169 (Wyo. 1989) .............................................................31
Town of Jackson v. Shaw,
  569 P.2d 1246 (Wyo. 1977) ....................................... 37, 43, 44, 53
Weaver v. Mitchell,
  715 P.2d 1361 (Wyo. 1986) ............................... 22, 23, 27, 28, 31, 34

## Constitutional Provisions

U.S. Const. Amend. XIV, § 1 ...............................................................55

## Federal Statutes and Rules

28 U.S.C. § 1291 ..................................................................................2
28 U.S.C. § 1332 ..................................................................................2
Fed. R. App. P. 4(A)(1)(A) ...................................................................2

## State Statutes

35 Pa. Cons. Stat. Ann. § 7226 .........................................................53
Vt. Stat. Ann. Tit. 20, § 2734 ............................................................53
WY Stat. § 1-21-1206(c)-(d)...............................................................54

## Other Authorities

11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE &
  PROCEDURE § 2814 (3d ed. 2014) ....................................................41
Black's Law Dictionary ......................................................................38
Wyoming Civil Pattern Jury Instruction 4.06.................................. 42, 43

## PRIOR OR RELATED APPEALS

There are no prior or related appeals.

## JURISDICTIONAL STATEMENT

**District Court.**  The district court had jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332.  Plaintiff-appellee Amber Nicole Lompe ("Plaintiff") is a citizen and resident of Wyoming and the complaint sought damages in excess of $75,000.  (24, 26.)[1]  Defendants-appellants Sunridge and AMC are Utah limited liability companies with their principal places of business in Utah.  (24, 25, 35, 41.)

**Court of Appeals.**  This is a direct appeal from a final order of the United States District Court for the District of Wyoming.  This Court has jurisdiction under 28 U.S.C. § 1291.

**Filing Dates.**  The district court entered judgment in favor of Plaintiff on December 26, 2013.  (164.)  On October 21, 2014, the district court denied Defendants' renewed motion for judgment as a matter of law or, in the alternative, for a new trial or remittitur ("Renewed JMOL Motion").  (287.)  Defendants timely filed their notice of appeal on November 17, 2014, within thirty days of the denial of the Renewed JMOL Motion under Federal Rule of Appellate Procedure

---

[1] All numbers in parentheses refer to pages of Appellants' Appendix.  Transcripts are cited in the form "page#:line#s."

1

4(a)(1)(A).  (315.)

**Finality of Order.**  The district court's order denying Defendants' Renewed

JMOL Motion is a final order that disposes of all parties' claims.

<u>STATEMENT OF THE ISSUES</u>

1.      Whether the punitive damages awards must be reversed because

Plaintiff failed to present evidence sufficient to show that Defendants engaged in

"willful and wanton misconduct," as required by Wyoming law;

2.      Whether the punitive damages awards must be reversed because

Plaintiff failed to present evidence of each Defendant's net worth as of the time of

trial, as required by Wyoming law;

3.      Whether the district court erred in failing to adequately instruct the

jury on the requirements under Wyoming law for the imposition of punitive

damages;

4.      Whether the district court erred in denying Defendants' Renewed

JMOL Motion under common law excessiveness grounds, where the punitive

damages awards were equal to or exceeded all of Defendants' pre-tax earnings that

had been distributed to Defendants' members during the five years prior to trial;

5.      Whether the punitive damages awards – $22.5 million against AMC

and $3 million against Sunridge, 11.5:1 and 4:1, respectively – are grossly

excessive and arbitrary in violation of the Fourteenth Amendment of the U.S. Constitution; and

6.    Whether the punitive damages awards violate Due Process because they punish persons not before the district court, bear no relationship to the allegedly wrongful conduct, and punish AMC for conduct beyond Wyoming.

## STATEMENT OF THE CASE

## I.    NATURE OF THE CASE

Sunridge purchased the Sunridge Apartment complex in Casper, Wyoming in 2007, and hired AMC, an experienced property management company, to manage and maintain the complex.  On February 1, 2011, the furnace in Plaintiff's unit malfunctioned, and she was exposed to carbon monoxide ("CO") in her apartment as a result.  An AMC employee called 911 and helped Plaintiff out of her apartment, along with a representative of the gas utility company, also called by AMC.  Plaintiff went to the emergency room, received treatment for CO exposure, and was discharged later that same day.  In May 2012, Plaintiff sued Sunridge and AMC for negligence, seeking recovery of medical expenses, pain and suffering, loss of enjoyment of life, caretaking expenses, costs, and punitive damages.  Plaintiff alleged she suffered a permanent brain injury as a result of the accident and argued Defendants were negligent in failing to replace all 96 furnaces at the complex, and in failing to inspect them on an annual, preventative basis.

3

In December 2013, Plaintiff's claims were tried to a jury, which returned a verdict in favor of Plaintiff, awarding Plaintiff $3 million in compensatory damages, and allocating fault as follows:  10% to the Plaintiff, 25% to Sunridge, and 65% to AMC.  The jury also awarded Plaintiff $25.5 million in punitive damages – $3 million against Sunridge (four times the Sunridge compensatory award) and $22.5 million against AMC (11.5 times the AMC compensatory award).  The district court entered judgment on the jury's verdict and, after the court denied Defendants' post-judgment motion, Defendants filed this appeal.

## II.    STATEMENT OF THE FACTS

Because Defendants are arguing, among other things, that they were entitled to judgment as a matter of law on Plaintiff's claim for punitive damages, Defendants have endeavored to present the facts in the light most favorable to Plaintiff.

### A.    Sunridge Partners, LLC

Brothers Robert and Jeff Ctvrtlik acquired the Sunridge Apartments in the fall of 2007, through Sunridge Partners, LLC.  (1548:1-1549:16, 1559:3-11.)  Prior to the purchase, Sunridge commissioned a property condition report in order to obtain financing for the purchase (the "LandAmerica Report").  (708:21-25, 713:18-714:12, 1553:23-1554:23; 1961.)  The LandAmerica Report indicated that there were some immediate needs at the complex, including, for example, asphalt

4

and siding repairs, as well as repairs needed in the future. (1555:16-1557:3.) The Report stated that "[c]apital replacement reserves over the term of the report will be required for items such as . . . forced air furnace replacements." (1968.) The Report also indicated the HVAC systems were in "fair condition," which it defined as "[s]atisfactory, however some short term and/or immediate attention is required or recommended, primarily due to the normal aging and wear of the building system, to return the system to a good condition." (1970, 1980.) Based on the twenty-five year expected useful life of the furnaces, the LandAmerica Report concluded that reserves should be created in the next one to five years (i.e., 2012) to account for the expected replacement of the furnaces. (1989; see also 1586:5-1587:13.)

Sunridge hired AMC to manage the Sunridge Apartments on a day-to-day basis and to take care of the property. (1519:3-5, 1551:3-1552:24; 2023.) Pursuant to the Defendants' contract, Sunridge has the right to approve in advance expenditures over one thousand dollars unless AMC deems the expense to relate to a health and safety issue. (1567:6-21; 2027-28.) Sunridge generally communicates with AMC management personnel and not with AMC employees on-site, and Sunridge relies on AMC as to capital expenditures recommendations, but retains the right to approve such expenditures. (1552:3-9, 1557:21-1558:4, 1559:18-1560:10, 1567:6-21.) Bob Ctvrtlik testified that Sunridge did not direct

AMC as to how to maintain the furnaces at the complex and that Sunridge never received any recommendations concerning a furnace maintenance program. (1560:2-10.)

Ctvrtlik also testified that, prior to the lawsuit, he had no knowledge of the risks of CO or of any CO accidents other than Plaintiff's. (1560:11-1561:6, 1575:15-23.)

### B.     Apartment Management Consultants, L.L.C.

AMC is a property management company with operations in thirteen states, managing 300 properties, including four in Wyoming. (1927:3-5; 1928:22-1929:9.)

At Sunridge, AMC was in charge of day-to-day matters, including collecting rents, paying the bills, and taking care of the grounds. (1552:3-12.) Under Defendants' agreement, AMC receives a 3.4% management fee from Sunridge based on the effective monthly gross income of the complex, i.e., rental and other income. (1927:3-17.) This means that the amount AMC is paid by Sunridge is unaffected by expenditures AMC makes to maintain the property, such as to maintain or replace the furnaces. (1927:18-1928:2.)

It was undisputed at trial that AMC regularly replaced furnace filters, arranged for maintenance of any furnace in need of repair, and replaced furnaces if they failed. (455:2-7, 496:25-497:12, 657:23-658:5, 1214:3-12, 1515:7-1516:24.)

Furnace repair, service, and replacement were done frequently, on an as-needed basis. (Id.) Although not required by Wyoming law, it was also undisputed that AMC's policy was to provide tenants at Sunridge with CO detectors, although tenants sometimes disabled detectors or otherwise failed to keep them working. (656:19-657:13, 661:8-20, 1247:5-1249:6, 1517:12-1518:1, 1529:19-1531:11.)

Carbon monoxide is a colorless, odorless gas that is a byproduct of combustion. (812:17-813:1.) Because it is colorless and odorless, it was generally acknowledged by all witnesses who were asked that the best way to protect against CO exposure is to use a CO detector. (498:8-24, 609:19-25.)

A former employee of AMC, Valerie Mesenbrink, who was the on-site manager at Sunridge during 2007-2008, testified that she obtained bids for yearly inspections on all the furnaces at the complex in late 2007 or early 2008. (640:9-641:1, 642:10-16.) According to Mesenbrink, the bids were never acted on. (642:10-16.)

Mesenbrink also testified that there was a "continual problem" of furnace pilot lights going out and that, in her opinion, between 2007 and 2011, the condition of the complex deteriorated. (654:23-25, 655:23-656:3.) Mike Coryell, a technician from the local natural gas utility, SourceGas, who was called to the complex on the day of Plaintiff's accident, testified that he had made furnace service calls to Sunridge for 24 years. (426:4-6, 427:1-9.) He further testified that,

7

prior to the accident, the furnaces were dirty, but "[t]hey were not putting out carbon monoxide.  They were not a danger."  (426:4-427:9, 432:2-5.)  Over Defendants' objection, Plaintiff's expert, Michael Slifka, a fire protection engineer, testified that someone at SourceGas verbally recommended to Mesenbrink that AMC should have a preventive maintenance program for the furnaces.[2]  (759:19-762:1.)  Other than this hearsay testimony, Slifka's opinion at trial that Defendants were violating industry standards and the International Building and Fire Codes by not having an annual maintenance program rather than servicing the furnaces as issues arose was the first time either Defendant was so informed.  (703:11-705:13.)

The on-site manager at Sunridge who succeeded Mesenbrink, Mike Few, testified that in 2009 and 2010 he was under pressure to run the property efficiently.  (1279:11-1281:3.)  Few also testified, however, that he was never under any type of budgetary restriction for "life safety issues" − for example, if a furnace was "red-tagged"[3] and needed to be replaced, it was.  (1326:17-1327:1.)

---

[2] The source of this information was an affidavit previously submitted by Mesenbrink.  The court refused to allow Mesenbrink to testify about this alleged conversation with SourceGas, but, over Defendants' objection, permitted Slifka to testify about it.  (631:9-640:4, 759:19-762:1.)  Even if that had been reliable, admissible evidence, rather than hearsay-on-hearsay from an unnamed speaker, it is undisputed that SourceGas made no such recommendation on the day of the accident, when its supposed importance should have been evident, to say the least.
[3] A "red tag" indicates danger and that the furnace cannot be turned back on until the problem has been corrected or the furnace replaced.  (421:3-16.)

8

### C.    <u>Local Practice Regarding Furnace Maintenance</u>

The local HVAC contractor, John Haid, called by Plaintiff and Defendants, testified that maintenance on the furnaces at Sunridge was consistent with his experience with other commercial properties in the area. (495:15-497:19.) According to Haid, it is most common to be called by a customer when there is a problem, as was done at Sunridge, because "[v]ery few people" have a preventative maintenance program. (<u>Id.</u>) This was consistent with the experience of AMC's regional property manager, Stephanie Brooks, who testified that there is nothing unusual, in her twenty-five years of experience in property management, with contacting a contractor when there is a problem, rather than instituting a preventative maintenance program. (1508:3-13, 1515:2-1517:5.)

### D.    <u>Plaintiff Moves In to Unit 436</u>

Plaintiff moved into unit 436 at the Sunridge Apartments in September 2010. (1122:14-21, 1123:10-13.) There was no evidence that Plaintiff or any other tenant made complaints to AMC (or anyone else) about their furnaces, of any kind, much less that any complaints were ignored.

Plaintiff testified that, when she moved in, no one from Sunridge or AMC spoke to her about the furnace. (1127:14-19.) When asked whether she had a working CO detector in her unit at the time she moved in, Plaintiff testified as follows:

> No. Um, I had what I thought was one, um, that was on top of the fridge when I moved in, and then, um, I put it – there was – I can't remember if there was no battery in it or if there was, um, an old battery in there, but it kept saying – it didn't work right. It kept, um, beeping, and it said "low" on the little screen. Um, and so I got a new battery and replugged it in, and it still wasn't working, so . . . .

(1127:20-1128:4.) This testimony was confirmed by Plaintiff's boyfriend, Evan Points at Him, who said that Plaintiff showed him a "white kind of box thing" that "looked like a thermostat." (1205:15-24.) He testified that they did not know what it was. (1205:20-24.) Thinking the device was broken and that it belonged to the prior tenant, Plaintiff testified that she threw out the CO detector. (1150:17-1152:9.) Plaintiff never asked for another CO detector, and never told AMC about throwing it away. (1148:3-7, 1151:9-1152:12.)

### E. The Accident

On February 1, 2011, Few (who lived at Sunridge) was walking down the hallway near Plaintiff's apartment and smelled something that resembled car exhaust. (1337:13-1338:18.) Few contacted then-AMC maintenance technician Scott Kemberling who confirmed that he too smelled something. (1338:23-1339:7.) Kemberling called SourceGas to have someone come out to confirm there was not a gas leak. (1339:4-9.) SourceGas dispatched Mike Coryell to Sunridge. (385:7-386:21.) When he arrived, Coryell met up with Kemberling, turned on a CO monitor, and the two men made their way to unit 436. (386:20-

388:19.)  As they approached, Coryell's monitor indicated the presence of CO. (388:22-389:23.)  Upon arriving at unit 436, which was on the third floor of the building, the men knocked, Plaintiff opened the door from a seated position and then "slumped back down."  (390:23-391:9.)  Plaintiff was unable to stand, but Kemberling helped pull her out of the apartment.  (391:18-392:7, 1217:25-1218:9.) While Kemberling called 911, Coryell shut the gas off at the furnace and opened the sliding door to ventilate the apartment.  (393:18-22.)

Plaintiff was taken by ambulance to the hospital where she was observed in the emergency room and received hyperbaric treatment for exposure to CO. (955:20-956:18, 1412:20-1415:19.)  Plaintiff was discharged that same day. (1003:17-1004:20.)  Plaintiff's furnace was replaced and she returned to her apartment approximately 10 days after the accident.  (476:18-480:7, 1196:11-1197:4.)

Plaintiff's medical experts testified that she suffered a permanent brain injury as a result of her exposure to CO.  (850:20-24.)  Defendants' experts did not dispute that Plaintiff suffered a brain injury; they did dispute its permanency and extent.  (1445:18-22.)

### F.    AMC Responds to the Accident

After shutting off the gas, Coryell "red tagged" Plaintiff's furnace because he found a plugged heat exchanger and vent spillage from the furnace.  (419:17-

11

420:20.)  Coryell and Few then went to each of the apartments on the third floor of the building and checked for CO.  (401:1-14.)  In addition to Plaintiff's apartment, Coryell detected CO in two other apartments, only one of which had a furnace emitting a slight amount of CO.  (402:11-24.)  Coryell shut off that furnace and red-tagged it as well.  (403:1-3, 420:12-20; 421:7-22.)  SourceGas did not inspect all the furnaces in the entire building, nor did it determine it should inspect all the furnaces at the complex following the accident.  (400:4-401:14, 432:6-10.)  A few days later, Haid replaced Plaintiff's furnace.  (476:3-480:7.)

### G.    The Alleged Prior Incidents

During trial, Plaintiff's counsel referred repeatedly to prior CO incidents which allegedly should have put Defendants (or at least AMC) on notice of furnace problems at the complex.  (342:5-345:1.)  Of the "multiple incidents" referred to at trial, the actual evidence showed only <u>three</u> which involved CO.[4]  First, on January 23, 2009, Haid was called to Sunridge "possibly for a [CO] tester going off or something or they smelled gas," second, Few was exposed to CO (without further effects) in October 2009, while working in the complex's clubhouse, and third, on

---

[4] Slifka testified that he listed in his report "about 12 events starting in 2009 in which there are carbon monoxide leaks, gas valve failures, problems with venting, et cetera, that are indicating of furnaces one by one failing, which is ultimately what's happening when you have an aged fleet past its useful life."  (711:15-20.)  No fact witnesses, however, corroborated Slifka's assertions concerning the alleged "12 events."  The "list of events" Slifka relied upon was provided by Plaintiff's counsel.  (753:9-754:3.)

12

January 4, 2010, Haid was called to Sunridge to "[p]ut in a new gas valve" and clean a furnace "due to blowback," which Plaintiff's attorney characterized as "blowing back [CO]."[5] (469:22-470:17, 473:6-474:25, 1273:2-20.) The other prior "incidents" referred to by Plaintiff's counsel involved pilot lights going out or other routine repairs – not CO leaks. (See, e.g., 464:12-468:14.) Haid testified that a furnace does not need to be replaced merely because of problems with the pilot light or other routine repairs. (495:1-12.)

H. **The Alleged "Cover Up"**

Plaintiff's attorneys argued that Defendants "engaged in a post-accident cover-up, in an insidious attempt to blame [Plaintiff] for the incident and avoid liability for her damages." (260; 1805:15-20.) The alleged "cover up" in fact concerned only whether there was a CO detector in Plaintiff's unit at or before the accident. Plaintiff's "cover up" evidence is as follows:

- An alleged pre-accident, October 2010 photograph of an unplugged CO detector in Plaintiff's apartment that was never produced (1301:14-1304:24);

- "Turn sheet" forms that were used to document the condition of an apartment when someone moves out in preparation for a new tenant were never produced for Plaintiff's unit, even though Mesenbrink testified that the forms were generally not maintained (647:13-650:25, 1354:12-1356:10);

- The witness statements of Kemberling and Haid were typed by Few, not by the witnesses themselves (however, neither witness identified any material inconsistencies between the typed statements and their recollection) (1297:3-

---

[5] Haid testified that the January 4, 2010 incident involved "the flame actually roll[ing] out of the furnace." (473:15-474:22.)

13

18, 1300:3-21);

- Photographs of Plaintiff's apartment on the day of the accident allegedly taken by Few, which he denied taking, were never produced (658:6-659:13, 1219:12-21, 1292:7-24); and

- Few, Kemberling, and Haid testified that an unplugged CO detector was found in Plaintiff's apartment the day of the accident, but Plaintiff testified that she previously threw away the only CO detector (488:6-489:20, 1151:9-24, 1232:23-1234:9, 1340:6-1341:22).

The foregoing "covered up" nothing.  To the contrary, there was never any dispute that Plaintiff was exposed to CO, that the source of the CO was her furnace, that there was a CO detector in her apartment when she moved in, and that she threw it away before the accident.

## III.  <u>TRIAL PROCEEDINGS</u>

Plaintiff filed this case in May 2012, asserting negligence and seeking punitive damages against Defendants.  (23.)  The case was tried in two phases in December 2013.  Plaintiff's liability case spanned nine trial days; Sunridge and AMC defended liability in two.  The punitive damages phase of the case took one day.

### A.  <u>Phase I (Liability)</u>

Plaintiff's negligence theory was that Defendants should have inspected all the furnaces annually on a preventative basis and replaced or planned to replace the entire fleet of furnaces.  (1747:9-16, 1748:5-22.)  Plaintiff claims this "would have prevented [her] poisoning and her brain injury."  (1748:23-25; <u>see also</u> 67-68.)

14

Plaintiff's liability theory as to each Defendant was direct negligence, not vicarious liability or agency.  (1702:19-1707:22.)

At the close of Plaintiff's evidence, Defendants moved for a directed verdict. (1359:19-1368:25.)  The district court deferred ruling on the issue of punitive damages until after all the evidence was heard.  (1388:5-8.)

Defendants renewed their motion for directed verdict on punitive damages at the close of their case.  (1643:23-1649:4.)  The district court denied Defendants' motion, but characterized the punitive damages evidence this way:

> . . . I'll allow that [punitive damages] evidence to go to the jury . . . .  <u>I recognize that that evidence for a disfavored form of relief is, is weak</u>, and I say it's weak because . . . it is a failure to act rather than an act done in a negligent way.  <u>It is further an act that . . . smacks highly of inattention on the part of the defendants in this case as well as ignorance</u>, if I accept the statement of – the testimony of Miss Brooks, the regional manager who persists in calling the poisonous gas $CO_2$, and <u>doesn't seem to have a grasp of the danger</u>.

(1664:2-12 (emphases added).)

1.    <u>The District Court's Punitive Damages Instructions</u>

With respect to the availability of punitive damages, Defendants proffered two instructions:

> "Willful and wanton misconduct has been defined as that which tends to take on the aspect of highly unreasonable conduct, or an extreme departure from ordinary care, in a situation where a high degree of danger is apparent."
> (Defs' Proposed Instruction No. 11)

15

> "The aggravating factor which distinguishes willful misconduct from ordinary negligence is the actor's state of mind.  In order to prove that an actor has engaged in willful misconduct, one must demonstrate that he acted with a state of mind that approaches intent to do harm."
> (Defs' Proposed Instruction No. 12)

Both were refused.  (1723:3-1724:6; 82-83.)

Instead, the jury was instructed that it may "award additional punitive damages against that defendant if, and only if, you find by a preponderance of the evidence that that defendant was guilty of willful and wanton misconduct."  (128.) The jury was further instructed that "[w]illful and wanton misconduct is the intentional doing of an act, or an intentional failure to do an act, in reckless disregard of the consequences, and under such circumstances and conditions that a reasonable person would know, or have reason to know, that such conduct would, with a high degree of probability, result in harm to another."  (Id.)  During deliberations, the jury asked for a definition of "wanton."  (153.)  The district court then referred the jury to previously given Instruction No. 42 and gave the jury one of Defendants' proffered instructions (No. 11).  (Id.; see also 1841:17-1846:13.)

### 2.    The Jury's Liability Verdict

On December 19, 2013, the jury found by a preponderance of the evidence that Sunridge, AMC – and Plaintiff – were negligent and a cause of Plaintiff's injuries.  (155-56.)  The jury apportioned 10% fault to Plaintiff, 25% fault to Sunridge, and 65% fault to AMC.  (156.)  The jury awarded Plaintiff a total of

$3,000,000.00 in compensatory damages − $2,700,000.00 after taking into account Plaintiff's fault.  (157.)

The jury also found by a preponderance of the evidence that punitive damages should be awarded.  (157-58.)

**B.    Phase II (Amount of Punitive Damages)**

The next morning the parties proceeded with the punitive damages phase. During opening statements, Plaintiff's counsel told the jury that it should consider "how much does it take to punish the company to get [Defendants'] attention" and that the jury would "learn about the millions of dollars that AMC made, about the millions of dollars that Sunridge makes just on this one property."  (1869:9-20.) Thereafter, through only the testimony of Plaintiff's lost wages expert, Dr. Paul Randle, and his spreadsheets summarizing Defendants' tax returns, Plaintiff put on evidence of what Plaintiff called "the income [and] profitability of" AMC and Sunridge.  (1874:8-1876:13.)

**1.    Randle's Testimony About Sunridge's Cash Flow**

Randle summarized Sunridge's income (and its members' shares of company income) from 2007 through 2012 based on Sunridge's tax returns. (1877:20-1878:5; 2022.)  Randle's summary chart was admitted into evidence over Defendants' objection.  (1858:13-1864:18, 1878:6-12.)  Randle testified that because Sunridge is a limited liability company, all of its income is distributed to

17

the owners of the company.  (1882:10-21.)  To calculate what he called the

company's "net cash flow," Randle reversed non-cash expenses, like depreciation.

(1883:3-1887:1.)  Having thus reversed Sunridge's losses, Randle concluded that

the pre-tax "total net cash flow" for Sunridge from 2007 through 2012 – already

distributed to its members – was $1,594,741.  (1887:5-9.)  Randle made no effort

to account for historical and future capital expenditures, payment of principal on

outstanding debt, or the actual equity of the company.  On cross-examination,

Randle insisted that Sunridge was profitable, despite conceding that, as of

September 30, 2013, Sunridge had assets of $5,650,115.50 and liabilities of

$5,843,662.94, and was incurring losses in excess of $100,000 per month in

August and September 2013.  (1914:4-1917:2; 2035-36.)

### 2.    Randle's Testimony About AMC's Cash Flow

Randle did not calculate the revenue AMC earned from managing Sunridge.

Instead, he added up the revenue from all AMC operations for all other properties

and activities in all thirteen states where it does business.[6]  (1876:4-1877:3,

1908:22-1910:10; 2021.)  Defendants objected to Plaintiff's introduction of

evidence that had nothing to do with AMC's management of Sunridge.  (1888:1-

1889:13.)  The district court overruled the objection.  (1889:16-22, 1891:14-25.)

Randle testified that AMC's <u>total pre-tax member income</u> for 2007 to 2012,

---

[6] Randle also included AMC revenues for all of 2007, even though AMC managed
Sunridge for only four months in 2007.

including compensation paid to company officers (a company liability, not an asset), was $22,929,549.[7]  (1895:22-1898:1.)

### 3.  Defendants' Rebuttal Testimony

Defendants called AMC's regional property manager, Candace Capitelli. She testified that AMC manages over 300 properties in thirteen states, including four properties in Wyoming.  (1928:24-1929:9.)  Capitelli explained that AMC receives a fee from Sunridge for managing the complex pursuant to the parties' agreement, which is a percentage of the property's effective gross income (i.e., rental and other income).  (1927:6-18.)  As a result, if any maintenance expenses need to be incurred, such as furnace repair or replacement, the amount AMC is paid by Sunridge is unaffected.  (1927:18-1928:2.)  In contrast, if rental rates drop, the amount AMC makes from Sunridge is reduced because gross income (rents) from the property decline.  (Id.)  Capitelli also testified that Sunridge had lost money over the last twelve months.  (1928:3-12.)

Capitelli further testified that since the lawsuit was filed, AMC added a "carbon monoxide addendum" to its leases, informing tenants that a CO detector was installed in their units and if the detector starts to beep, the tenants need to

---

[7] Randle nowhere accounted for either company's income tax liability.  (See, e.g., 1882:10-21, 1890:12-21.)  So, for example, assuming a combined state and federal income tax rate of 40%, AMC's total net income for the period 2007-2012 (not including officer compensation) after taxes would be roughly $12.75 million – nowhere near the $22.9 million "net income" figure advanced by Randle.

contact AMC.  (1918:5-1920:3.)  In addition, AMC installed hardwired (as

opposed to wall outlet) CO detectors and increased its on-site inventory of CO

detectors generally.  (1920:12-1921:9.)  Finally, AMC conducted a "top-to-bottom

full" inspection of all the furnaces at Sunridge.  (1923:1-10, 1924:16-20.)  There

was no testimony, during either phase of trial, about whether Defendants' profited

from the allegedly wrongful conduct, including, for example, how much or

whether furnace replacement or an annual preventative maintenance program

would have affected either Defendant's finances.

        **4.**     <u>Plaintiff Asks the Jury to Punish Defendants for "Gambling"</u>
<u>with "Hundreds of People's Lives."</u>

In closing, Plaintiff's counsel told the jury that "[f]rom 2007 until 2011

[Defendants] left those furnaces to endanger the people in that complex.  AMC

stood by and watched as [its] own manager was poisoned, and then we watched the

cover-up."  (1944:5-18.)  Plaintiff's counsel speculated that "[i]t would have been

expensive to replace the furnaces" (despite the lack of evidence of the amount) and

told the jury that "[y]ou've seen the profit. . . . You know how much they were

making . . . . Sunridge and AMC profited by this gamble."  (1944:19-1945:3.)

According to Plaintiff's counsel, Defendants "don't get to make [the] choice that

they're gonna gamble" with "hundreds of people's lives."  (1954:2-11.)  As to the

amount, Plaintiff's counsel argued that "if it's a mom-and-pop operation, the

punishment needs to be different.  When we're talking about multiple millions of

dollars, nothing will change unless the punishment is appropriate." [8]  (1945:10-13.)

5.    The Jury Awards a Combined $25.5 Million in Punitive Damages

The jury assessed $3,000,000.00 in punitive damages against Sunridge – nearly twice what Randle had calculated as its "net cash flow" over the prior five years – and $22,500,000.00 against AMC – a figure nearly identical to every dollar paid to AMC's members from all operations for the prior five years.  (162-63.)  On December 26, 2013, the district court entered judgment against Sunridge in the amount of $3,750,000.00 and against AMC in the amount of $24,450,000.00. (164-64.)

C.    **Defendants' Post-Trial Motion**

Defendants timely renewed their motion for judgment as a matter of law and moved in the alternative for a new trial or remittitur.  (166.)  The district court denied Defendants' motion.  (287.)  In so doing, the district court failed to separately analyze Defendants' different acts and states of mind – and circularly concluded that the evidence was sufficient to support the jury's decision to award punitive damages because the jury, in fact, did so.  (307.)  The district court also concluded that the punitive damages awards did not "cross the constitutional line"

---

[8] Plaintiff's emotional appeals to the jury reached a crescendo with this question: "How do we change the future?  It takes a lot of courage," causing the district court to interrupt, telling the jurors, "Use your reason and common sense.  We're not sending you out on D-day."  (1957:11-15.)

because it determined that the ratios were in fact 1:1 for Sunridge and 7.5:1 for

AMC, rather than the actual 4:1 and 11.5:1 ratios.  (312.)  (Neither party took such

a position.)  The district court necessarily came up with these new, lower ratios by

using the combined compensatory award, rather than the compensatory award

attributable to each Defendant, and the portion of the award allocated to Plaintiff:

> AMC: $22,500,000 (punitive damages) ÷ $3,000,000
> (total compensatory damages) = 7.5
>
> Sunridge: $3,000,000 (punitive damages) ÷ $3,000,000
> (total compensatory damages) = 1

The district court then concluded that its ratios did not shock the conscience under

any standard.  (313-14.)

　　　　This appeal followed.

## SUMMARY OF THE ARGUMENT

　　　　The district court should have granted to Defendants judgment as a matter of

law on Plaintiff's punitive damages claim.  That claim was based solely on

Defendants' failure to annually inspect or replace all 96 furnaces at Sunridge.

Plaintiff claimed that a mere failure to act in the face of notice of potential harm is

sufficient to support punitive damages, but Wyoming has long rejected this

position.  Instead, punitive damages in Wyoming are only allowed "with caution"

and "within narrow limits."  Weaver v. Mitchell, 715 P.2d 1361, 1369 (Wyo.

1986).  Not only was there no evidence that either Defendant intended to harm

Plaintiff or anyone else, the evidence showed that Sunridge, for example, first learned of the dangers of CO at trial and that AMC's policy – both before and after trial – was to equip each apartment with a CO detector, and that AMC maintained and replaced furnaces as needed. To recover, Plaintiff must have shown "a state of mind . . . approach[ing] intent to do harm" necessary for the imposition of punitive damages. Cramer v. Powder River Coal, LLC, 204 P.3d 974, 979-80 (Wyo. 2009) (quotation omitted). Here, the trial record supporting punitive damages – in the district court's words – was "weak" and showed "inattention" or failure to appreciate the risk. Where that is the case, Wyoming will not allow punitive liability. Weaver, 715 P.3d at 1370 (punitive damages not allowed for inattention or mistake).

Of course, even if Plaintiff had shown that Defendants acted with something approaching an intent to harm, Plaintiff failed to put on evidence of Defendants' net worth as of the time of trial, required in Wyoming to demonstrate ability to pay while avoiding the financial annihilation of a defendant. See Rosty v. Skaj, 272 P.3d 947, 959 (Wyo. 2012). Instead, Plaintiff elected to introduce year after year of pre-tax cash flows and member distributions, without so much as attempting to find a time-of-trial net worth for either company, and the result is the jury's seizure of everything either Defendant generated for half a decade.

The jury did so in part because the district court declined to instruct it that even intentional action is not necessarily willful and wanton conduct, and that something more, a showing of "evil intent" or of "conduct involving some element of outrage, similar to that usually found in a crime," is required. <u>Farmers Ins. Exch. v. Shirley</u>, 958 P.2d 1040, 1051-52 (Wyo. 1998) (quotations omitted). The jury asked for more instruction, Defendants sought more instruction, Plaintiff conceded the standard, and yet the jury was not so advised. Nothing about these punitive damages awards reflects Wyoming's "cautious," "narrow limits" approach to punitive damages, and the jury was not given instruction adequate to the dimensions of the task.

These awards – which to Defendants' (and the district court's) knowledge are the largest-ever in Wyoming history – must be reversed or, at a minimum, remitted because they are excessive under common law. Plaintiff was awarded $22.5 million against AMC – nearly <u>all</u> of AMC's total pre-tax member income for the five years prior to trial – and Plaintiff was awarded $3 million against Sunridge – two times everything Sunridge earned and distributed over that same five year period. Wyoming law requires punishment without destruction, yet the awards here will destroy Defendants, and they are impermissible under any standard as a result.

24

Finally, the punitive damages awards – a staggering $22.5 million against AMC and $3 million against Sunridge – are grossly excessive and arbitrary under the due process guarantees of the Fourteenth Amendment, as set forth in State Farm Mutual Automobile Insurance Company v. Campbell, 538 U.S. 408 (2003), and its progeny.  These awards are 11.5 times AMC's compensatory award and 4 times Sunridge's compensatory award.  Yet, single-digit maximums are the outer bounds of what is appropriate "in all but the most exceptional of cases." Exxon Shipping Co. v. Baker, 554 U.S. 471, 514-15 (2008) (quotation omitted).  In addition, Plaintiff's $2.7 million compensatory award is, by any measure, substantial and where "compensatory damages are substantial, . . . a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." State Farm, 538 U.S. at 425.  The maximum award available here – assuming any is to be allowed at all – is 1 to 1 – or $750,000 against Sunridge and $1,950,000 against AMC.

Finally, awards of this size, and on this financial record, further violate due process because they improperly punish Defendants' individual members (nonparties) and bear no relationship to Defendants' allegedly wrongful conduct.

Defendants do not herein appeal Plaintiff's $3 million compensatory award, reduced to $2.7 million to reflect her responsibility for this accident.  But the

unjustifiable, excessive, and unconstitutional punitive damages awards must be reversed.

## ARGUMENT

### I.  DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES.

Defendants moved for judgment as a matter of law on Plaintiff's claim for punitive damages at the close of Plaintiff's case, again at the close of all evidence, and renewed their motion post-trial.  (1359:19-1368:25, 1643:23-1649:4; 166-221.) The district court denied Defendants' motions.  (1388:5-8, 1664:2-12; 287-314.)

**Standard of Review.**  This Court reviews de novo the denial of judgment as a matter of law.  Jones v. United Parcel Service, Inc., 674 F.3d 1187, 1200 (10th Cir. 2012).  Judgment as a matter of law is required when there is "no legally sufficient evidentiary basis to find for the nonmoving party."  Id. (quotation omitted).  "The issue of whether there is sufficient evidence to justify punitive damages is a question of law, and [the Court's] review is confined to the assessment of whether the plaintiff presented evidence sufficient that a reasonable person might conclude that the defendant acted in a punitive manner."  Mason v. Texaco, Inc., 948 F.2d 1546, 1560 (10th Cir. 1991).

### A.  Plaintiff Failed to Prove by a Preponderance of the Evidence that Either Defendant Engaged in "Willful and Wanton Misconduct."

Because this is a diversity case, Plaintiff's entitlement to punitive damages is

26

governed by Wyoming law.  <u>Jones</u>, 674 F.3d at 1200.  In Wyoming, "[p]unitive

damages are not a favorite of the law and are to be allowed with caution within

narrow limits."  <u>Weaver</u>, 715 P.2d at 1369.  Thus, punitive damages are to be

awarded "<u>only</u> for conduct involving some element of outrage, similar to that

usually found in crime."  <u>Id.</u> (emphasis added).  "Punitive damages are not

appropriate in circumstances involving inattention, inadvertence, thoughtlessness,

mistake, or even gross negligence."  <u>Id.</u> at 1370.  Instead, a plaintiff may recover

punitive damages only if he proves by a preponderance of the evidence that the

defendant engaged in "willful and wanton misconduct," defined in Wyoming as

> the intentional doing of an act, or an intentional failure to
> do an act, in reckless disregard of the consequences and
> under circumstances and conditions that a reasonable
> person would know, or have reason to know that such
> conduct would, in a high degree of probability, result in
> harm to another.

<u>Id.</u> at 1370.  "The aggravating factor which distinguishes willful misconduct from

ordinary negligence is the actor's state of mind.  In order to prove that an actor has

engaged in willful misconduct, <u>one must demonstrate that he acted with a state of</u>

<u>mind that approaches intent to do harm</u>."  <u>Cramer</u>, 204 P.3d at 979-80 (emphasis

added; quotation omitted).  Moreover, Plaintiff must prove that <u>each</u> Defendant

acted with that state of mind.  <u>See, e.g.</u>, <u>Bell v. Clackamas County</u>, 341 F.3d 858,

867-68 (9th Cir. 2003) ("the degree of reprehensibility of each of the defendant's

misconduct" must be evaluated individually, not en grosse); <u>McFadden v. Sanchez</u>,

27

710 F.2d 907, 913-14 (2nd Cir. 1983) (plaintiff "must establish that each defendant

. . . engaged in conduct which was sufficiently aggravated to justify the imposition

of [punitive] damages" (quotation omitted)).

Below, Plaintiff combined – and overstated – the evidence against each

Defendant in order to ensure that punitive damages would be assessed against both,

where none could issue against either alone.[9]  (See, e.g., 256-257.)

### 1.    No Legally Sufficient Evidentiary Basis Exists to Assess Punitive Damages Against Sunridge.

There was no evidence at trial that Sunridge engaged in "conduct involving

some element of outrage, similar to that usually found in crime," Weaver, 715 P.2d

at 1369, nor that it acted with a state of mind approaching "intent to do harm,"

Cramer, 204 P.3d at 979-80.  To the contrary, the evidence at trial was that

Sunridge purchased the apartment complex as a passive real estate investment, and

retained an experienced property manager, AMC, to run and maintain the facility.

There was no evidence that AMC was an unfit choice for property manager.[10]  In

fact, the evidence at trial was that AMC was a well-thought of, growing property

management company with operations in multiple states.  (See, e.g., 1551:3-6,

1565:12-19, 1579:13-19.)  There were no citations or violations issued at Sunridge

---

[9] In denying Defendants' post-trial motion, the district court declined even to refer
to either Defendant by name in evaluating the sufficiency of the evidence in
support of the punitive damages awards.  (306-14.)

[10] Plaintiff did not assert a claim against either Defendant for negligent hiring or
supervision.  (28-31.)

concerning the furnaces, of any kind.  In fact, the sole witness from SourceGas,

Mike Coryell, testified to the contrary − that he had made service calls to Sunridge

for 24 years and that the furnaces "were not putting out carbon monoxide.  <u>They</u>

<u>were not a danger</u>."  (432:4-5 (emphasis added).)  And the day of Plaintiff's

accident – the day when both Defendants' conduct in allegedly ignoring a known

problem with the furnaces at Sunridge purportedly came to a head – SourceGas did

not require (or conduct) a facility-wide furnace inspection, and it did not "red tag"

the entire fleet.  Instead, Coryell testified that he red-tagged Plaintiff's furnace

(which AMC then replaced), and he inspected only the other furnaces on her floor,

red-tagging one other, which was also replaced.  (420:11-421:22, 432:6-10.)  If the

furnaces were an obvious danger, as Plaintiff insists, SourceGas could have – and

would have – required that they all be taken out of service.  (426:14-21.)  It did

not.

     Nor was there evidence that Sunridge declined to implement a preventative

maintenance program due to expense or for any other reason.  In fact, there was no

evidence at trial that Sunridge even knew that any annual preventative inspection

bids were obtained, and no evidence that Sunridge was told that someone at

SourceGas supposedly verbally recommended an annual inspection program for

the complex's furnaces.[11]  (642:10-16, 1559:21-1560:10, 1569:22-1570:18.)  Nor

was there evidence at trial about any profits from the allegedly wrongful conduct,

e.g., the cost to Sunridge to replace all the furnaces, or the effect (if any) on

Sunridge's finances of doing so, or of not doing so.

Ctvrtlik's trial testimony that he was <u>not</u> told about Few's accidental

exposure to CO in the leasing office in 2009 was undisputed.  (<u>See</u> 1560:11-15.)

In fact, there was <u>no</u> evidence of complaints (or even communication) from anyone

to Sunridge about the furnaces at all after purchase, including from Plaintiff, much

less evidence that Sunridge ignored or intentionally disregarded such complaints.

(1560:11-1561:2.)[12]  Even if that were not the case, Sunridge never communicated

with SourceGas or Haid, who AMC retained to fix, service and replace the

furnaces as needed, nor did Sunridge interact with any other vendor providing

services at the complex.

Plaintiff's <u>only</u> punitive damages evidence concerning Sunridge was the

LandAmerica Report, which described the property as being in "generally good

overall condition given its age" and concluded that "[a]dequate maintenance of the

. . . Property's major systems, components, and equipment appear to be in place

---

[11] As noted above, the jury received this testimony, not from SourceGas and not
even through former AMC employee Mesenbrink, who claimed in an affidavit that
an (unidentified) person at SourceGas made the recommendation orally, but
through Plaintiff's expert witness, Slifka.  (<u>See</u> <u>supra</u> n. 2.)

[12] The evidence showed that Sunridge did not even appreciate the risks of CO
generally until trial.  (1560:11-1561:2, 1575:8-23.)

including appropriate preventative maintenance." (1967.) The Report deemed the HVAC system to be in "fair" condition, included reserves for what it assumed would be the "ongoing expected replacement" of the furnaces, and, as to "Fire/Life Safety" matters, "[n]o observed or reported deficiencies were noted." (1965, 1967, 1970, 1981-82.) The Report says nothing about CO, CO detectors, or danger from the furnaces. It also does not say that the furnaces must be immediately replaced, or inspected – annually or otherwise – it only contains a financial assumption that the owners would need to set aside reserves over a period of years for the furnaces' eventual replacement.

In short, Plaintiff did not show that Sunridge intentionally refused to replace or service its furnaces, knowing that tenants could be hurt or killed by CO as a result. See Weaver, 715 P.2d at 1370 (punitive damages only for "circumstances involving outrageous conduct"). Even if Sunridge's actual "conduct may have been less than reasonable under the circumstances," that is not enough − punitive damages involve "more than unreasonable conduct; it involves willfulness." Stephenson v. Pac. Power & Light Co., 779 P.2d 1169, 1175 (Wyo. 1989) (quotation omitted).

Sunridge is entitled to judgment as a matter of law on Plaintiff's claim for punitive damages.

31

2.     <u>No Legally Sufficient Evidentiary Basis Exists to Assess</u>
<u>Punitive Damages Against AMC.</u>

As to AMC, Plaintiff again contends "<u>Defendants</u>" "refus[ed] to replace or
maintain the old, dangerous furnace fleet at the [Sunridge] apartments despite
repeated instances of furnace failures, despite being explicitly warned that the
furnaces needed inspection and maintenance or replacement, and even after
collecting and considering bids for such safety maintenance, and even after <u>their</u>
own employee was poisoned by CO by another dangerous furnace."[13]  (256
(emphases added).)  Yet there was no evidence at trial that AMC <u>ever</u> refused to
repair or replace a malfunctioning or non-functioning furnace.  Plaintiff <u>never</u>
contacted AMC to complain about her furnace, before or after her accident.
(1150:17-1152:9.)  And Plaintiff adduced <u>no</u> evidence that any other tenant
complained about his or her furnace, or about AMC's servicing of furnaces, either.
There was no evidence at trial that AMC was negligent in retaining Haid or any
other service provider to service the complex's furnaces.  Moreover, Plaintiff's
evidence showed that, far from refusing to service the furnaces, or negligently or
rarely doing so, AMC regularly replaced furnace filters at Sunridge, called Haid

---

[13] The alleged "explicit warn[ing]" is the hearsay-on-hearsay testimony by
Plaintiff's expert that an unidentified person at SourceGas verbally recommended
to an AMC employee prior to the accident that the Sunridge furnaces should have
an annual preventative inspection.  (759:19-761:22.)  No corroborating evidence of
this supposed recommendation exists − including from the sole SourceGas trial
witness, Coryell, who, to the contrary, inspected only the furnaces on Plaintiff's
floor on the date of the accident and did not take the fleet out of service.

32

and other HVAC professionals every time a furnace was in need of service, and that AMC replaced any furnace that failed and could not be repaired.[14] (See, e.g., 496:1-17, 1516:20-1517:5, 1536:18-1537:2.)

Nor did the evidence show that AMC profited from the allegedly wrongful conduct. Under its contract with Sunridge, AMC is paid 3.4% of the effective monthly gross income at the complex – which figure is unaffected by expenditures on repairs, service, or furnace replacements. (1552:10-1553:20, 1927:3-23.) Furthermore, the parties' agreement did not permit AMC to make capital expenditures without the approval of Sunridge. (2023, 2027-28.)

And even though not required by Wyoming law, AMC's policy was to equip the Sunridge units with a working CO detector.[15] (1247:5-20, 1517:12-1518:1.) The evidence showed that while not every unit had a working CO detector in it at all times, former AMC employee Kemberling (called by Plaintiff) testified that he inspected the Sunridge units every six months, replaced missing CO detectors and

___

[14] The evidence at trial showed that AMC's practice of repairing or replacing on an as-needed basis is consistent with the local industry custom. (495:6-497:20.) Courts generally recognize that a defendant's compliance with industry custom negates the mental state necessary for the imposition of punitive damages. See, e.g., Alley v. Gubser Dev. Co., 785 F.2d 849, 856 (10th Cir. 1986) (district court erred in denying motions for a directed verdict on punitive damages where "[t]he record fail[ed] to establish that the defendants did anything other than conform to industry standards in producing the wood products and in constructing the mobile home").

[15] There was no dispute at trial that a CO detector is the most effective way to prevent CO exposure, and that CO exposure is a risk presented by all gas-fired appliances − regardless of age or maintenance schedule. (498:8-24, 609:19-25.)

installed new batteries in them if needed, and ordered new CO detectors as needed. (1245:12-1249:6.)  The undisputed testimony about providing CO detectors as a matter of AMC "policy" precludes the imposition of punitive damages since it negates the requisite quasi-criminal, outrageous state of mind approaching the intent to do harm.  Even assuming that AMC's policy of equipping the units with CO detectors was not implemented perfectly, this is not evidence that AMC acted or failed to act "with a state of mind that approaches intent to do harm," Cramer, 204 P.3d at 979-80 (quotation omitted), or with "some element of outrage, similar to that usually found in crime," Weaver, 715 P.2d at 1369.  To the contrary, "the failure to follow safety procedures may constitute evidence of ordinary negligence," but it does not demonstrate "a state of mind approaching an intent to do harm."  Krier v. Safeway Stores 46, Inc., 943 P.2d 405, 417 (Wyo. 1997) (quotation and alteration omitted; emphasis added).

Mike Few's exposure to CO in the complex leasing office – which had no CO detector because no one slept there – in October of 2009 also does not support punitive damages liability.  (1273:2-20.)  The evidence showed that after his exposure, Few was treated and returned to working – and living – at Sunridge. (1307:17-1308:23, 1327:2-7.)  AMC did not decline to do anything after or as a result of  Few's accident – to the contrary, it called SourceGas and replaced the office furnace with a new one.  (651:22-653:16; 2010-13.)  And after Few's

exposure, SourceGas did not insist on inspecting all the furnaces, nor did it red tag the entire fleet of furnaces at Sunridge.  It did, and said, nothing.  No one else, and no tenant, was exposed to CO before or after Few's accident until Plaintiff's accident some fifteen months later.  (461:7-471:16, 473:6-476:17.)

AMC is entitled to judgment as a matter of law on Plaintiff's claim for punitive damages.

*     *     *

In the face of the foregoing, Plaintiff's punitive damages strategy at trial evolved to include an alleged "cover up."  According to Plaintiff, punitive damages were warranted because of Defendants' "callous disregard for the tenants at Sunridge, coupled with a cover-up of the circumstances that caused [Plaintiff's] poisoning."  (256-57.)  Yet there was no "cover up" of Plaintiff's accident, or of anything else, by anyone.  There was never any dispute that (1) Plaintiff was poisoned by CO in her apartment; (2) the source of the CO was her furnace; and (3) Plaintiff had, at least upon move-in, a CO detector in her apartment.  And there was no evidence at trial that anyone, at any time, "covered up" anything about the furnaces' age, condition, or maintenance.  In other words, there was no "cover-up" at all, let alone one that could be used to support a punitive damages award, but one was argued because without it, this was only a case about an accident – and one where the Plaintiff herself was partially responsible.

As for viewing the evidence in the light most favorable to Plaintiff, the district court could only characterize the punitive damages evidence as "weak," smacking of "inattention" and "ignorance," and of a failure to "grasp [ ] the danger." (1664:2-12.)[16]  As the Wyoming Supreme Court has observed,

> Sometimes the line between conduct justifying punitive damages and less culpable conduct is indeed fine.  Here, the conduct of appellant does not approach that fine line.  [Plaintiffs] presented a series of apparent negligent acts of omission and commission and, through skillful trial advocacy, parlayed them into a verdict for punitive damages.

Weaver, 715 P.2d at 1371 (citation omitted).  The conduct of Sunridge and AMC may not have been ideal, but – at worst – it showed merely inattention or mistake as to the risks.  Defendants are entitled to judgment as a matter of law on Plaintiff's claim for punitive damages.

## B.     Plaintiff Failed to Introduce Evidence of Defendants' "Net Worth."

Even assuming evidence supporting punitive damages at all, Plaintiff failed to introduce evidence demonstrating that Defendants had the ability to pay the massive punitive damages awards, as required by Wyoming law.  This also justifies judgment as a matter of law.

---

[16] The district court never assessed whether the standard for the imposition of punitive damages had been met at trial.  Instead, the district court ruled that, because the jury found the Defendants' conduct to be willful and wanton, Defendants were necessarily willful and wanton.  (307.)

Wyoming courts are clear that punitive damages "are not recoverable to in any way compensate the plaintiff but are assessable solely for the purpose of punishment and deterrence."  Town of Jackson v. Shaw, 569 P.2d 1246, 1253 (Wyo. 1977).  This means that "[t]he punitive allowance should be in an amount that would promote the public interest without financially annihilating the defendants."  Id.  Because Wyoming prohibits a punitive damages award that exceeds a defendant's current financial ability to pay, "in the absence of evidence of a defendant's wealth or financial condition an award of punitive damages cannot be sustained."  Rosty, 272 P.3d at 959 (quotation omitted); see also Adel v. Parkhurst, 681 P.2d 886, 892 (Wyo. 1984) (reversing punitive damages award in the absence of evidence of defendant's wealth).  Wyoming courts define "wealth or financial condition" to mean evidence of a defendant's "assets or net worth" as of the time of trial.  Rosty, 272 P.3d at 959 & n.2 (citing Jonathan Woodner Co. v. Breeden, 665 A.2d 929, 941 (D.C. 1995) ("[S]ince current net worth fairly depicts a tortfeasor's ability to pay punitive damages, the plaintiffs here were required to present sufficient proof of current net worth to support the punitive damages awarded by the jury.")).

Here, Plaintiff's trial evidence did not address either Defendant's time-of-trial ability to pay a punitive damages award of the size requested, but instead consisted of inflammatory but irrelevant numbers intended to inflate the awards:

37

Defendants' pre-tax <u>profits</u> for the five years prior to trial – which had long since been distributed to Defendants' <u>members</u>.  (1883:3-1887:9, 1895:22-1898:1.) Defendants' profits earned and distributed in the years prior to trial "do[] not constitute evidence of [their] wealth" or their time-of-trial ability to pay.  <u>Rosty</u>, 272 P.3d at 959 (evidence that defendant was salaried and employed insufficient to support punitive damages award); <u>see</u> <u>also</u> <u>Zazú Designs v. L'Oréal, S.A.</u>, 979 F.2d 499, 508 (7th Cir. 1992) ("Net worth is a measure of profits that have not yet been distributed to the investors."); BLACK'S LAW DICTIONARY 1845 (10th ed. 2014) (current net worth is "[a] measure of one's wealth, usu[ally] calculated as the excess of total assets over total liabilities").  In fact, with respect to AMC, Randle readily admitted that the company has "very insignificant assets." (1892:22-23.)

Waving years' worth of Defendants' long-since distributed profits in front of the jury had the predictable effect of causing, not the assessment of Defendants' time-of-trial ability to pay for deterrence purposes, but runaway awards that amounted to the seizure of every dollar ever made and distributed by either company in the past five years.  Defendants are entitled to judgment as a matter of law on Plaintiff's claim for punitive damages.  <u>Rosty</u>, 272 P.3d at 959 & n.2; <u>see</u> <u>also</u> <u>Hansuld v. Lariat Diesel Corp.</u>, Case No. 85515, 2014 WL 2931248, at *5

(Wyo. Dist. Ct. Order Feb. 10, 2014) (unpublished) ("The absence of evidence concerning the parties' financial conditions . . . is dispositive.").

## II.  THE DISTRICT COURT'S INSTRUCTIONS TO THE JURY ON PUNITIVE DAMAGES WERE INADEQUATE AND PREJUDICIAL.

Overruling Defendants' objection, and declining to give Proposed Instructions 11 and 12, the district court gave Wyoming Civil Pattern Jury Instruction 4.06, in the form of Instruction No. 42.  (128.)  During its deliberations, the jury asked the Court to define "wanton."  (1723:3-1724:6; 153.)  In response, the district court referred the jury to Instruction No. 42, and gave Defendants' proposed Instruction No. 11. (153; see also 1841:17-1846:13.)  Defendants' Proposed Instruction No. 12 (never given) would have instructed the jury that "[t]he aggravating factor which distinguishes willful misconduct from ordinary negligence is the actor's state of mind.  In order to prove that an actor has engaged in willful misconduct, one must demonstrate that he acted with a state of mind that approaches intent to do harm."  (83.)  Defendants moved for a new trial based on the district court's inadequate and prejudicial instruction of the jury as to punitive damages, which was denied.  (166, 287.)

**Standard of Review.**  This Court "review[s] the district court's decision to give a particular jury instruction for abuse of discretion and consider[s] the instruction as a whole de novo to determine whether they accurately informed the jury of the governing law."  Jones, 674 F.3d at 1198 (quotation omitted).  "Faulty

jury instructions require reversal when (1) we have substantial doubt whether the instructions, considered as a whole, properly guided the jury in its deliberations; and (2) when a deficient jury instruction is prejudicial." Id. (quotation omitted).

In Farmers Insurance Exchange v. Shirley, the jury was given the same instruction as the jury was here in Instruction No. 42 (128), both of which followed Wyoming Civil Pattern Jury Instruction 4.06. 958 P.2d at 1051. In Shirley, the Wyoming Supreme Court concluded this instruction, although accurate, was inadequate. Id. The court explained that "specific language . . . should be given as follows: For punitive damages to be awarded in addition to compensatory damages for the tort, there must be a showing of an evil intent deserving of punishment or something in the nature of special ill-will or wanton disregard of duty or gross or outrageous conduct." Id. (citation and quotation omitted; emphasis added). The jury is to be instructed as to the difference between a tort – which "requires only that the defendant act intentionally" – and punitive damages − which require "more than intentional action." Id. at 1051-52. Ultimately, the court concluded that punitive damages

> are to be awarded only for conduct involving some element of outrage, similar to that usually found in crime. The jury should be so advised, and the point should be clearly communicated that intentional action does not necessarily involve willful and wanton misconduct.

Id. at 1052 (quotation omitted; emphases added).[17]

The jury in this case was not so advised. The district court's refusal to make clear the outrageous, quasi-criminal state of mind required for the imposition of punitive damages, id. at 1052, and instruct the jury that (as Plaintiff's counsel conceded) "the case law in Wyoming says it's a state of mind approaching intent [to harm], and that is to differentiate it between gross negligence, mistake, inadvertence, accident," prejudiced Defendants by allowing punitive damages at all – much less the staggering punitive damages awards that are the subject of this appeal. (1378:22-25.) As a result, if this Court concludes the evidence was sufficient to support a punitive damages award, a new trial on punitive damages is required. See Level 3 Commc'ns, LLC v. Liebert Corp., 535 F.3d 1146, 1158 (10th Cir. 2008) (reversing and remanding for a new trial based on faulty jury instructions); see also 11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2814 (3d ed. 2014).[18]

---

[17] The question is not whether the instruction mirrors the pattern, but whether it "adequately informed the jury of applicable law." Banks v. Crowner, 694 P.2d 101, 105 (Wyo. 1985); see also Hashimoto v. Marathon Pipe Line Co., 767 P.2d 158, 163-64 (Wyo. 1989) (rejecting phrasing of several pattern jury instructions as illogical and improper). The instructions here did not.

[18] Defendants do not appeal the jury's verdict on liability or the compensatory damages awarded to Plaintiff ($2.7 million).

## III.    DEFENDANTS ARE ENTITLED TO A NEW TRIAL OR REMITTITUR BECAUSE THE PUNITIVE DAMAGES AWARDS ARE EXCESSIVE.

Defendants moved for a new trial or remittitur, arguing the punitive damages were excessive, which motion the court denied, summarily concluding that, "[w]hile surprising, the award does not shock the judicial conscience."  (166; 314.)

**Standard of Review.**  "In reviewing an award of punitive damages, the . . . district court . . . determine[s] whether the jury's verdict is within the confines set by state law, and . . . determine[s], by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered.  The court of appeals . . . review[s] the district court's determination under an abuse-of-discretion standard."  Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 279 (1989).  Although the standard is abuse of discretion, "the degree of discretion enjoyed by trial courts in these matters is relatively narrow."  Payne v. Jones, 711 F.3d 85, 100 (2d Cir. 2012) (citing BMW of N. Am., Inc. v. Gore, 517 U.S. 559 (1996)).

In Wyoming, "[p]unitive damages are awarded not as compensation for injury and loss suffered by the plaintiff, but rather as punishment of the defendant and deterrence of future similar conduct by others."  Cates v. Eddy, 669 P.2d 912, 921 (Wyo. 1983).  Wyoming courts have made clear that "[w]rongdoers may be punished" but only "without being destroyed" and, therefore, punitive damages

should not be awarded in amounts that would "financially annihilat[e]" a defendant.  Shaw, 569 P.2d at 1253.  And "[i]f the verdict is so large . . . that it shocks the judicial conscience," it must be remitted or remanded for a new trial.  Cates, 669 P.2d at 922.

Here, even assuming the conduct and financial evidence presented by Plaintiff were sufficient to support an award of punitive damages, the punitive damages awards would financially annihilate Defendants and are, therefore, excessive as a matter of law.  The $22,500,000 award against AMC is nearly 100% of AMC's total (pre-tax) member income for the years 2007-2012 – which was $22,929,549.  And the $3,000,000 award against Sunridge represents almost twice Sunridge's "total net cash flow" for the years 2007 through 2012 of $1,594,741, calculated by Plaintiff's expert.  Because these amounts are equal to or in excess of all profits earned (and distributed) by Defendants during the five years prior to trial, they are prohibited by Wyoming law and necessarily unconscionable and excessive.  See, e.g., Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992) (punitive damages awards of 50% and 30%, respectively, of defendants' net worth were "excessive as a matter of law"); Albert H. Wohlers & Co. v. Bartgis, 969 P.2d 949, 962 (Nev. 1998) (punitive damages award that was "nearly twenty-one percent of [defendant's] net worth" was excessive); Barragan v. Banco BCH, 188 Cal. App. 3d 283, 302 (1986) ($2 million judgment that represents more than twice

bank's net worth is "unconscionable and excessive as a matter of law").

Indeed, these punitive damages awards are so far beyond what has ever been upheld – or even contemplated – in Wyoming,[19] there can be no conclusion other than that "the verdict was the result of passion or prejudice" requiring a new trial or substantial remittitur.  <u>Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.</u>, 703 F.2d 1152, 1168 (10th Cir. 1981).  This is particularly true where, as here, Plaintiff's attorneys repeatedly and improperly asked the jury to "send a message" and punish Defendants (and their members) for "gambling" with people's lives. (1865:22-1870:19, 1953:15-1957:24.)

## IV.   THE PUNITIVE DAMAGES AWARDS ARE GROSSLY EXCESSIVE AND ARBITRARY UNDER THE FOURTEENTH AMENDMENT AND MUST BE REDUCED.

In their post-judgment motion, Defendants argued that the punitive damages awards ($22.5 million against AMC, 11.5:1, and $3 million against Sunridge, 4:1) are unconstitutionally excessive in violation of due process under the Fourteenth Amendment to the United States Constitution.  (210-217.)  The district court rejected Defendants' arguments.  (287.)

---

[19] The district court acknowledged it had "not made such a large award for punitive damages" and was "far greater than that usually seen in [the] district."  (313.)  <u>See also</u> <u>Cates</u>, 669 P.2d at 922 (punitive damages award of $200,000 is excessive by $100,000); <u>Shaw</u>, 569 P.2d at 1256 ($10,000 punitive damages award was "unconscionable" and "excessive" by $8,000).

**Standard of Review.**  The determination of whether a punitive damage

award is constitutional is reviewed de novo.  <u>Jones</u>, 674 F.3d at 1206.

"The Due Process Clause of the Fourteenth Amendment prohibits the

imposition of grossly excessive or arbitrary punishments on a tortfeasor."  <u>Jones</u>,

674 F.3d at 1206 (quotation and alteration omitted).  In analyzing the

constitutionality of a punitive damages award, courts consider "(1) the degree of

reprehensibility of the defendant's action; (2) the disparity between the actual harm

suffered by the plaintiff and the punitive damage award; and (3) the difference

between the punitive damage award and the civil penalties authorized or imposed

in comparable cases."  <u>Id.</u> at 1207 (quotation omitted).[20]

## A.    <u>Plaintiff's Accident Was Not the Result of Reprehensible Conduct.</u>

"[T]he most important indicium of the reasonableness of a punitive damages

award is the degree of reprehensibility of the defendant's conduct."  <u>Gore</u>, 517

U.S. at 575.  Evaluating the degree of reprehensibility of a defendant's conduct

reflects the common sense principle "that some wrongs are more blameworthy than

others."  <u>Id.</u>  Importantly, contrary to the district court's assumption, the

reprehensibility of a defendant's conduct must be evaluated individually, as

opposed to collectively, <u>see</u> <u>Bell</u>, 341 F.3d at 867-68, and "it is crucial that a court

---

[20] The district court addressed these factors not in the context of a due process analysis, but to determine whether the evidence supported the jury's conclusion that punitive damages should be awarded.  (308-09.)

45

focus on the conduct related to the plaintiff's claim rather than the conduct of the defendant in general," <u>Williams v. ConAgra Poultry Co.</u>, 378 F.3d 790, 797 (8th Cir. 2004). In evaluating reprehensibility, courts consider "(1) whether the harm caused was physical as opposed to economic; (2) whether the defendant acted with indifference or a reckless disregard for the health or safety of others; (3) the financial vulnerability of the plaintiff; (4) whether the defendant's wrongful conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident." <u>Jones</u>, 674 F.3d at 1207. The harm here was physical, as opposed to economic.[21] The remaining four factors fail to show reprehensibility.

In summary fashion and with no reference to the record, the district court concluded the jury could have properly found the conduct of Defendants (collectively) sufficiently reprehensible because (1) Defendants failed to address "concerns" with the furnaces, even in the face of (unidentified) prior CO exposures, (2) Plaintiff and the other Sunridge tenants "did not possess equal bargaining power," (3) it was not an isolated incident, (4) Plaintiff could have been

---

[21] Although Plaintiff suffered a physical harm, Plaintiff's compensatory award included $1,550,000 in economic damages for lost future earning capacity and for past and future medical expenses. <u>See</u> <u>State Farm</u>, 538 U.S. at 420, 426. And as to physical injury, despite the jury's finding of liability for negligence, the district court declined to concede that the Plaintiff had been permanently disabled. (<u>See</u> 313 (". . . the carbon monoxide exposure <u>could have disabled</u> her for the rest of her life or could have been fatal" (emphasis added)).

46

disabled for the rest of her life, and (5) the potential for similar injuries to others was "great." (309, 313.) No aspect of the record was cited for these conclusions, and none exist. There was no evidence at trial of any tenant "concern" about the furnaces, and the court's oblique reference to unequal "bargaining power" is simply a non sequitur here. And even though there was one prior CO exposure, neither Sunridge nor AMC was ever cited or even criticized with regard to the furnaces – even after Plaintiff's accident. Their first notice of alleged wrongdoing with respect to the furnaces' age or condition was Plaintiff's trial theory.

**Indifference or Reckless Disregard.** The record also is devoid of any evidence that Defendants intended to injure Plaintiff or anyone else, or that they acted with reckless disregard for safety. To the contrary, it is undisputed that Sunridge had no knowledge of any prior incidents involving CO at Sunridge and it is undisputed that AMC used affirmative safety measures, such as CO detectors and professional furnace maintenance and repair, to care for the property and the tenants. There was no evidence at trial of tenant complaints, regulatory citations, or furnace problems that went unaddressed. The furnaces were operational, and were serviced and/or replaced promptly when they were not. Even on the day of the accident, SourceGas inspected no furnaces at the complex other than those on Plaintiff's floor, and it never ordered that anything be done with the entire "fleet" of furnaces at any time. Defendants were neither indifferent nor reckless with

47

regard to the safety of the tenants and the furnaces.

**Financial Vulnerability.**  While there is a financial disparity between Plaintiff and the entity Defendants, there is no evidence in this personal injury case that Defendants "targeted" Plaintiff (or anyone) for any reason, including financial vulnerability.  Clark v. Chrysler Corp., 436 F.3d 594, 604 (6th Cir. 2006) (reversing district court on financial vulnerability "[b]ecause Chrysler's wealth has no connection to the actual harm sustained by Mr. Clark" and declining to find reprehensibility merely "because Mr. Clark was a purchaser of one of Chrysler's vehicles and Chrysler has substantial financial resources").

**Repeated Unlawful Conduct or Isolated Incident.**  There was no evidence that Defendants knowingly engaged in any unlawful conduct at all, let alone repeatedly.  Gore, 517 U.S. at 576-66 ("[E]vidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law.").  In fact, AMC policy called for CO detectors, even though not required by Wyoming law.  No regulatory entity of any kind ever cited Defendants with respect to the furnaces – whether as to their age, maintenance, or repair – even after Plaintiff's accident, and any furnace that was red tagged was replaced.

**Intentional Malice, Trickery, or Deceit, or Mere Accident.**  This

48

negligence case was an accident.  Plaintiff was not tricked into or about anything with regard to her apartment, her furnace, or anything else.  Indeed, the jury found Plaintiff to be 10% at fault.  Plaintiff's accident itself was a public event and emergency personnel were called, and no misrepresentations were made about the furnaces to anyone ever.  Trickery and deceit neither caused nor contributed to this accident.

Defendants' conduct was not reprehensible.

## B. The Punitive Damages Awards Are Unconstitutionally Disproportionate and Unreasonable.

The second indicium of an unconstitutionally excessive punitive damages award "is its ratio to the actual harm inflicted on the plaintiff." Gore, 517 U.S. at 580 (citations and quotation omitted).  In undertaking the ratio analysis, "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." State Farm, 538 U.S. at 426.  "[A] single-digit maximum is appropriate in all but the most exceptional of cases, and when compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." Exxon Shipping Co., 554 U.S. at 514-15 (quotation and alteration omitted).

Here, Plaintiff's compensatory award is $2,700,000 – substantial by any measure.  See Jones, 674 F.3d at 1207-08 (reducing punitive damages ratio from

slightly over 3:1 to 1:1 in part because plaintiff's $630,307 in compensatory damages were "substantial").  The district court nowhere addressed the size of Plaintiff's $750,000 and $1,950,000 million compensatory awards against each Defendant.  (311-14.)  These compensatory awards are substantial, and they require reduction of the punitive damages awards to a ratio not exceeding 1:1. Jones, 674 F.3d at 1208.[22]

    The district court also elected to calculate ratios that compared each Defendant's punitive damages award to the total compensatory damages awarded, including the amount attributed to Plaintiff's own fault – $3,000,000 – rather than comparing each Defendant's punitive award against each Defendant's compensatory award, and despite the fact that Defendants were not jointly and severally liable.  In this way, the district court generated lower ratios of "1-to-1" for Sunridge, and "7.5-to-1" for AMC, concluding thereafter (without analysis) that the ratios were "within the realm of punitive damages that does not cross the constitutional line."  (312.)  The district court's method is as improper as its

---

[22] See also Boerner v. Brown & Williamson Tobacco Co., 394 F.3d 594, 603 (8th Cir. 2005) ("substantial compensatory damages award" of over $4 million against tobacco company required reduction of punitive damages ratio of approximately 1:1); Williams, 378 F.3d at 799 (reducing punitive damages from 10:1 to 1:1 due to "large compensatory award" of $600,000); Bach v. First Union Nat'l Bank, 486 F.3d 150, 156-57 (6th Cir. 2007) (reducing ratio to 1:1 where plaintiff had recovered $400,000 in "considerable" compensatory damages); Bridgeport Music, Inc. v. Justin Combs Publ'g, 507 F.3d 470, 490 (6th Cir. 2007) ("Given the large compensatory damages award of $366,939 . . . a ratio of closer to 1:1 or 2:1 is all that due process can tolerate in this case.").

conclusion.  See, e.g., Clark, 436 F.3d at 606 n.16 ("[A] ratio based on the full compensatory award would improperly punish Chrysler for conduct the jury determined to be the fault of the plaintiff"); Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists, 422 F.3d 949, 961 (9th Cir. 2005) (comparing "each plaintiff's individual compensatory damages with the punitive damages awards against each defendant more accurately reflects the true relationship between the harm for which a particular defendant is responsible, and the punitive damages assessed against that defendant").

Correctly calculating the ratios – 4:1 for Sunridge ($3,000,000/$750,000) and 11.5:1 for AMC ($22,500,000/$1,950,000) – shows that the punitive damages here are grossly excessive.  Moreover, given the unquestionably substantial multi-million dollar compensatory damages award, a ratio of 1:1 is "the outermost limit" of what due process permits.  State Farm, 538 U.S. at 425-26 ($1 million compensatory award for emotional distress is "substantial").[23]

### C.    The Absence of Comparable Civil Penalties or Judgments Confirms that the Punitive Damages Awards Are Unconstitutionally Excessive.

The unconstitutional nature of the jury's punitive damages awards is further confirmed by a review of comparable penalties.  See Jones, 674 F.3d at 1208

---

[23] Plaintiff's compensatory award here included $950,000 for "emotional distress (past and future)," (157), further demonstrating the excessive nature of these multi-million dollar punitive awards.  See State Farm, 538 U.S. at 426 (emotional distress damages duplicative of punitive award).

(comparing jury awards in other employment cases).  "The fundamental question is whether [Defendants] had reasonable notice that [their negligence] could result in such a large punitive award."  Cont'l Trend Res., Inc. v. OXY USA, Inc., 101 F.3d 634, 641 (10th Cir. 1996) (collecting cases).  There is no question here that Defendants did not.

Wyoming law does not require the replacement of furnaces at all, let alone after a particular number of years, nor does Wyoming law require the inspection of furnaces at any particular interval, or in any particular way.  (See, e.g., 697:14-698:3, 704:16-705:13, 707:3-708:10 (Slifka relied on unspecified portions of the International Building and Fire Codes as the basis for his opinion that the furnaces were not properly maintained).)  Wyoming also does not require CO detectors, as Defendants used here.  In those states that do require landlords to provide CO detectors, the civil penalties range from $50 per failure, see 35 Pa. Cons. Stat. Ann. § 7226, to a possible maximum fine of $10,000, see Vt. Stat. Ann. Tit. 20, § 2734.  Thus, here, as in Gore, "[n]one of these statutes would provide an out-of-state [company] with fair notice that the first violation  . . . might subject an offender to a multimillion dollar penalty."  517 U.S. at 584.

Moreover, the very statute relied upon by Plaintiff to establish the standard of care applicable to Defendants (see, e.g., 294-95), the Wyoming Residential Rental Property Act, provides only that "[d]amages awarded to the renter may

include rent improperly retained or collected" or a "refund of the balance of the rent and the deposit on the rental unit." WY Stat. § 1-21-1206(c)-(d). Neither of these modest rent abatement and refund provisions bears any relationship whatsoever to the $3 million and $22.5 million punitive damages awards assessed by the jury.

Nor did Wyoming case law – or that of any other state – provide Defendants with notice that a jury would be allowed to deprive Defendants of all of their earnings (and then some) if there was a CO accident.[24] To the contrary, Wyoming law put Defendants on notice that they would not be "financially annihilat[ed]" by a punitive damages award. Shaw, 569 P.2d at 1253. Yet this is exactly what happened here. Because no comparable civil penalties or judgments exist – in Wyoming or otherwise – Defendants were not and could not have been on notice that failing to annually inspect or replace the furnaces would result in any punishment at all, much less the loss of five years of earnings, from all operations, or more.

If the Court finds that Plaintiff submitted evidence sufficient to support an

---

[24] See supra n.19; see also Sears, Roebuck & Co. v. Harris, 630 So. 2d 1018, 1022 (Ala. 1993) ($2.5 million total punitive damages verdict in which one plaintiff died and three others were injured from CO exposure); Killough v. Jahandarfard, 578 So. 2d 1041, 1047 (Ala. 1991) ($2.5 million punitive damages verdict against a landlord in CO death case); Kilmer v. Browning, 806 S.W.2d 75, 78 & 80 (Mo. Ct. App. 1991) ($300,000 damages for "aggravating circumstances" which "are akin to punitive damages" in favor of plaintiffs for the CO exposure death of their son).

award of punitive damages, this record supports nothing more than a one-to-one

ratio for each Defendant – $750,000 punitive damages for Sunridge and

$1,950,000 for AMC.  See Jones, 674 F.3d at 1208 (remanding with order to

reduce punitive damages to amounts equal to compensatory damages).

**V.    THE PUNITIVE DAMAGES AWARDS VIOLATE DUE PROCESS
BY PUNISHING PERSONS NOT BEFORE THE COURT AND
BECAUSE THEY BEAR NO RELATIONSHIP TO THE
ALLEGEDLY WRONGFUL CONDUCT.**

Defendants argued that the punitive damages awards ($22.5 million against

AMC and $3 million against Sunridge) violated due process under the Fourteenth

Amendment because the jury improperly awarded profits from all of Defendants'

operations, which had already been distributed to the companies' members, and

which amounts bore no relationship to any wrongful conduct.  (177-178, 210-217.)

Defendants also objected to the admission of Randle's testimony concerning

revenues earned by AMC outside of Wyoming, which objection was overruled.

(1888:1-1889:22, 1891:21-24.)  The district court rejected Defendants' arguments.

(287.)

**Standard of Review.**  This Court reviews de novo the determination of

whether a punitive damage award is constitutional.  See Jones, 674 F.3d at 1206.

54

A.    **Due Process Prohibits Punishment of Persons Not Before the Court.**

Due Process prohibits "punishing an individual without first providing that individual with an opportunity to present every available defense." Philip Morris USA v. Williams, 549 U.S. 346, 353 (2007) (quotation omitted); see also U.S. Const. amend. XIV, § 1.  Here, however, Plaintiff tasked the jury with punishing Defendants' members – individuals who were not parties to the lawsuit, were not before the court, and who had no opportunity to defend themselves.

The evidence of Defendants' profits put on by Plaintiff included only amounts distributed to Defendants' members.  Randle explained to the jury that because they are limited liability companies, Defendants' net income (if any) must be distributed to their owners or members.  (1882:10-21, 1890:6-21, 1893:13-1894:16.)  For Sunridge, Randle calculated that the total adjusted net cash flow that was paid to the company's members during 2007-2012 was $1,594,741.  (1887:5-9; 2022.)  For AMC, Randle went so far as to identify distributions to AMC members by name, telling the jury that "[o]ver the long haul of the [$22,860,000] that was distributed to all of the [members of AMC during 2005-2012], Mr. [Greg] Wiseman took out $21,590,710, by far the lion's share of the income."  (1894:13-16; 2021.)

Plaintiff's attorney then urged the jury to punish Defendants' principals:

- "These brothers from California that decided to invest in Wyoming, this was not their first rodeo.  From 2007 until 2011 they left those furnaces to endanger the people in that complex. . . . They're two states away. . . . You know how much they were making."  (1944:9-1945:3.)

- "If AMC really cares, where are their leaders? . . . Where is Greg Wiseman, who made $6 million last year gambling with people's lives?  Where is Brenda Barrett, this executive senior vice president."  (1955:13-17.)[25]

In sum, Plaintiff argued that Defendants paid out millions of dollars in distributions to their members since 2007 and that these individuals – <u>nonparties</u> – must be punished, which Due Process does not allow.  <u>See</u> <u>Philip Morris USA</u>, 549 U.S. at 353.  Such punishment also violates basic principles of law governing the corporate form.  <u>Cf.</u> <u>Cont'l Trend Res. Inc. v. OXY USA, Inc.</u>, 810 F. Supp. 1520, 1533 (W.D. Oka. 1992), <u>aff'd</u>, 44 F.3d 1465 (10th Cir. 1995), <u>vacated</u>, 517 U.S. 1216 (1996), <u>remanded</u>, 101 F.3d 634 (10th Cir. 1996) ("The financial worth of a parent corporation is generally irrelevant in assessing punitive damages on a subsidiary unless the corporate veil is pierced.").  Defendants, not their members, were the subject of Plaintiff's claims.  The punitive damages awards must be reversed.

### B.   The Punitive Damages Awards Lack Any Connection to the Allegedly Wrongful Conduct.

The law also requires that the amount of punitive damages assessed against a defendant bear a reasonable relationship to the allegedly wrongful conduct.  <u>See,</u>

---

[25] Plaintiff chose not to call Wiseman and Barrett to testify at trial.

e.g., State Farm, 538 U.S. at 422 (punitive damages improperly "bore no relation to the Campbell's harm"); Gore, 517 U.S. at 568 ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition."); Shirley, 958 P.2d at 1052 ("If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss." (quotation omitted)).

Here, not only did Plaintiff present no evidence of Defendants' time-of-trial ability to pay, Plaintiff presented no evidence concerning the profitability (if any) of Defendants' allegedly wrongful conduct.  Plaintiff introduced no evidence about how much it would cost to replace the furnaces at Sunridge, let alone whether this amount exceeded what Sunridge was already spending on furnace maintenance/replacement and CO detectors.  Instead, the punitive damages award against Sunridge took two times all of the cash flow Sunridge earned in the five years before trial.  As to AMC, the evidence was undisputed that it did not profit at all from the failure to institute an annual inspection of the furnaces, or from failing to install new furnaces.  (1927:3-1928:2.)  Plaintiff argued such stunning awards were justified because Defendants "gambl[ed]" with "hundreds of people's lives." (1954:2-11.)

Further, Plaintiff's financial evidence consisted of the profits earned by AMC from all of its operations in thirteen different states. As a result, the jury necessarily punished AMC for conduct outside of Wyoming, even though there was no evidence – and no claims – at all about such conduct. This is impermissible. <u>See</u> <u>Gore</u>, 517 U.S. at 72 (a State "does not have the power" to punish a defendant "for conduct that was lawful where it occurred and that had no impact on [the State] or its residents"); <u>Cont'l Trend Res., Inc.</u>, 101 F.3d at 636.

Because the punitive damages awards bear no relationship to Defendants' allegedly wrongful conduct and, with respect to AMC, were based on profits AMC earned from operations around the country, the awards are unconstitutional and must be reversed.

## **CONCLUSION**

Defendants respectfully request that the Court **REVERSE** and **REMAND,** with directions to the district court to enter judgment in favor of Defendants on Plaintiff's claim for punitive damages. In the alternative, the Court should **REVERSE** and **REMAND** for a new trial on punitive damages. If the Court does not grant any of the foregoing, if should **REVERSE** and **REMAND** with directions to the district court to enter punitive damages awards equal to the compensatory damage awards assessed against each Defendant.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Pursuant to Federal Rule of Appellate Procedure 34(a), Appellants Sunridge Partners, LLC and Apartment Management Consultants, L.L.C. respectfully request that oral argument be permitted.  This case raises important legal issues regarding the appropriateness and constitutionality of substantial punitive damages awards.  In addition, the record is extensive, and this Court is likely to have questions that can be answered at oral argument.

Date: April 10, 2015.

Snell & Wilmer L.L.P.                    William, Porter, Day, & Neville, P.C.


<u>/s/ Amy F. Sorenson</u>                    Patrick J. Murphy
Amy F. Sorenson                          159 North Wolcott
Amber M. Mettler                         Suite 400
Douglas P. Farr                          Casper, Wyoming 82601
Snell & Wilmer LLP                       Tel: (307) 265-0700
15 West South Temple                     Fax: (307) 266-2306
Suite 1200                               pmurphy@wpdn.net
Salt Lake City, Utah 84101
Tel:  (801) 257-1900
Fax: (801) 257-1800
asorenson@swlaw.com
amettler@swlaw.com
dfarr@swlaw.com


*Attorneys for Appellants Sunridge Partners, LLC, and Apartment Management Consultants, L.L.C.*

59

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

1.    This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 13,842 words, excluding the

parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)

because this brief has been prepared in a proportionally spaced

typeface using Microsoft Word 2010 in a 14-point Times New Roman

font.

Date: April 10, 2015

/s/ Amy F. Sorenson

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

I hereby certify that with respect to the foregoing: (1) all required privacy redactions have been made per 10th Cir. R. 25.5; (2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents; (3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Security Essentials System Center Endpoint Protection version 1.195.2568.0, last updated April 9, 2015, and according to the program are free of viruses.

Dated: April 10, 2015

<u>/s/ Amy F. Sorenson</u>
*Attorney for Appellants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2015, the foregoing was served via this

Court's ECF system on the following attorneys for Amber Nicole Lompe:

G. Bryan Ulmer, III, Esq. (ulmer@spencelawyers.com)
Tyson E. Logan, Esq. (logan@spencelawyers.com)

**Privacy Redaction Certification:**  No privacy redactions were required.

**Paper Copy Certification:**  The paper copies of this brief to be submitted to

the clerk of this Court are exact copies of version submitted electronically.

**Virus Scan Certification:**  The digital form of this document submitted to

the Court was scanned for viruses using System Center Endpoint Protection

version 1.195.2640, last updated April 10, 2015, and according to the program the

document is virus-free.


/s/ Amy Sorenson

# <u>ATTACHMENTS</u>

**<u>Document</u>**                                                                                         **<u>Page</u>**

December 15, 2013 transcript of the district court's oral order denying
Defendants' motion for judgment as a matter of law on Plaintiff's
claim for punitive damages (Tr. 1725:20-1732:8)……………...………………….1

December 17, 2013 transcript of the district court's oral order denying
Defendants' renewed motion for judgment as a matter of law on
Plaintiff's claim for punitive damages (Tr. 2006:2-12)………………………...…10

December 18, 2013 transcript of the district court's oral order denying
Defendants' request to include Defendants' proposed jury instruction
Nos. 11 and 12 (Tr. 2064:3-2065:6)…………………………………………………17

Judgment (Dkt. 151)……………………………………………………..…..20

Order denying Defendants' renewed motion for judgment as a
matter of law or, in the alternative, for a new trial or
remittitur (Dkt. 207)………………………………………………..………..22

Plaintiff's Exhibit 69………………………………………………..….50

Plaintiff's Exhibit 70……………………………………………..…………….51

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3    ------------------------------------------------------------

4    AMBER NICOLE LOMPE,                  Case No. 12-CV-00088-J

5          Plaintiff,                     Volume X of XV
                                          (Pages 1607 through 1733)
6          vs.                           Cheyenne, Wyoming
                                          December 13, 2013
7    SUNRIDGE PARTNERS, LLC; and          9:35 a.m.
     APARTMENT MANAGEMENT
8    CONSULTANTS, LLC,

9          Defendants.                    **ORIGINAL**

10   ------------------------------------------------------------

11

12                  TRANSCRIPT OF TRIAL PROCEEDINGS

13           BEFORE THE HONORABLE ALAN B. JOHNSON
                 UNITED STATES DISTRICT JUDGE
14                    and a jury of eight

15
     APPEARANCES:
16
     For the Plaintiff:      MR. G. BRYAN ULMER III
17                           MR. TYSON LOGAN
                             Attorneys at Law
18                           THE SPENCE LAW FIRM
                             P.O. Box 548
19                           Jackson, WY 83001-0548

20   For the Defendants:     MR. PETER S. DUSBABEK
                             Attorney at Law
21                           MONTGOMERY KOLODNY AMATUZIO & DUSBABEK
                             2625 Redwing Road, Suite 200
22                           Fort Collins, CO 80526

23

24

25            OFFICIAL COURT REPORTER - (307)778-0078

     Proceedings recorded by mechanical stenography,
     transcript produced by computer.

**1**

1    infer for themselves, but we have direct testimony that there

2    was a high degree -- extremely high probability that somebody

3    else would be harmed from Mr. Slifka.

4            So, Your Honor, Mr. Kemberling also testified when

5    asked what do they do to make sure the furnaces are safe for

6    the residents who move into the apartments, and he says they

7    do nothing to make sure the furnaces are safe for tenants.

8    Mr. Haid says with respect to these old furnaces if you fail

9    to maintain them that something's going to happen.  Mr. Slifka

10   says that the probability was extremely high.

11           And the evidence isn't done, and so, Your Honor, at

12   this point I think that the directed verdict as to negligence

13   should be denied for the reasons stated and that the evidence

14   of punitive damages should also -- or supporting punitive

15   damages is in.  We have made a showing that would warrant

16   allowing a jury to determine whether this is willful and

17   wanton.  There's enough evidence to show intentional

18   disregard, there's extraordinary danger to persons, and the

19   jury should be allowed to make that determination, Your Honor.

20           THE COURT:  The Court will deny the motions that have

21   been made by the defense at this point.  I assume they will be

22   renewed at the close of all evidence in this case.

23           Addressing the motion for judgment as a matter of law

24   concerning the assertion of negligence in this case, I would

25   note that Mr. Haid, one of the early witnesses in this matter

Julie H. Thomas, RMR, CRR                          (307)778-0078

2

1   and a plumbing and heating contractor and the go-to person by

2   the management of Sunridge, Mr. Few from AMC, indicated or

3   testified about submitting safety maintenance bids, truly an

4   expensive process at a cost of about $280 per furnace for over

5   96 units, which would -- you know, you're approaching $28,000

6   in terms of the cost if it's all done at one time, but

7   certainly from 2'07 to 2011 there was certainly time to spread

8   that cost over a period of weeks, months, years, and not done.

9           Also, Haid, the expert, really is the only -- he and

10  Coryell were the only experts who were available at that time,

11  advised that the furnaces should be inspected on an annual

12  basis.  And we've had testimony by Mr. Kemberling and by

13  Mr. Few that it was the practice to conduct inspections,

14  although there is virtually no documentation to substantiate

15  those inspections, and in addition it wasn't a meaningful

16  inspection.  There was no training of the individual as to

17  what to look for, how to conduct an inspection.  The

18  inspection was limited to taking out a filter and slipping in

19  a new filter, if that was done.

20          But there is no doubt that the management of the

21  apartment, AMC, had frequent access to the apartments at all

22  times during the time that it was managing and operating this

23  apartment enterprise for Sunridge to go into the apartments,

24  conduct their inspections, such as they were, and to document

25  the presence or lack of a presence of carbon monoxide

3

  1  detectors.

  2           Carbon monoxide, as everybody knows or should know, I

  3  wouldn't even hesitate to take judicial notice of it, but I

  4  don't think I need to in view of the testimony of Mr. Slifka

  5  and expert Cuzzillo and others during this case, is an

  6  odorless gas that kills and is exceedingly dangerous.  It's

  7  produced by incomplete combustion in this case from a natural

  8  gas furnace.  I don't know what Mr. Few smelled, I'm glad he

  9  did, in the hallway that day.  I doubt if it was automobile

 10  exhaust because the things that go out the tailpipe of an

 11  automobile are quite different than what comes out of a

 12  furnace, but dumb luck or whatever it was, eventually help

 13  arrived in kind of a lackadaisical way in that it seems to me

 14  that the first step that the manager and the maintenance man

 15  should have done would be to clear the area upon suspicion

 16  that there's gas.  Instead they went back down to the office

 17  and called Source Gas and waited for Source Gas to come.  And

 18  if it wasn't for Mr. Coryell testifying about taking the risk

 19  of going into that apartment and removing Ms. Lompe, the

 20  conditions could have been even worse than they have been

 21  testified to here today.

 22           So, too, although it's not a matter of evidence at

 23  this point, I thought at times maybe I'd ask the question, it

 24  seems to me that the control over all the aspects of this

 25  squarely fell within Sunridge and AMC.  Just by way of

Julie H. Thomas, RMR, CRR                              (307)778-0078

**4**

 1    example, there could have been consequences imposed for

 2    removal of their property by tenants or destruction of that

 3    property or even the unplugging of the CO detectors by way of

 4    keeping the damage deposit in order to reimburse that loss.

 5    What it points to more than anything else is that the

 6    turnaround inspections were not done on a regular basis and

 7    that the move-in inspection and the move-out inspections were

 8    not conducted in the presence of any management or person who

 9    would have taken notice concerning the detector portion of

10    this case.  And, in fact, the testimony I believe of Amber and

11    her mother are that they are the persons who, and the

12    boyfriend, Points At Him, but the mother and Amber were the

13    two that did the move-in inspection and endorsed it, and that

14    no one else was present when that occurred, and that it

15    happened quite a long period after the lease was signed and, I

16    suppose, any down payment and damage deposit was paid, none of

17    which do we know at this point from the evidence received.

18           Defendant would have the Court focus on a very narrow

19    portion of this case with regard to the negligence issue, and

20    that is knowledge of the precise defect that caused injury to

21    Amber Lompe, and Mr. Dusbabek correctly quotes and discusses

22    the testimony of Mr. Cuzzillo about the need for a mechanism

23    to produce carbon monoxide and a mechanism for its transport

24    outside.

25           It seems strange to me, if you accept the defendants'

```
 1    position that there were functioning carbon monoxide detectors

 2    everywhere in the building, there must have been a hell of a

 3    racket going on as these carbon monoxide detectors were going

 4    off right and left as a result of the issue that existed in

 5    Apartment 436 at 500 parts per million in that facility and

 6    over a hundred parts per million out in the hallway and in the

 7    adjoining apartments of Mr. Graham and in the apartment, but

 8    that would be sheer speculation in this case since what

 9    apparently was existing was silence during the time that

10    Miss Lompe was being exposed to carbon monoxide.  And

11    correctly this occurred over a period, a period of time.

12         The precise method -- and I think Dr. Cuzzillo did

13    testify as to the dirty heat exchanger and noted that an old

14    furnace such as this is highly stressed over its lifetime with

15    literally thousands of times that it is turned on and off and

16    brought up to temperature and then cooled again and brought up

17    again and again and again and subjected to the ash and other

18    problems that result from the combustion process.  So it's

19    been interesting to listen to their testimony in that regard.

20         Unfortunately, the property of Sunridge, that is, the

21    furnace in question, mysteriously disappeared very shortly

22    after Mr. Haid removed it from the premises, not pointing the

23    finger.  No one knows what happened to it, but a key item

24    necessary to fully expose the cause of the failure of this

25    furnace is lost forever.  All that can be said is from what
```

1   inspection could take place by Mr. Coryell at the time looking

2   through the diverter and Mr. Haid conducting his inspection

3   such as it was.  So the defendant's furnace is gone, and there

4   is no way to determine what the actual condition was of the

5   heat exchanger at the time.

6          The testimony in this case, and I look at the

7   testimony of Mr. Slifka, in particular, who really was sort of

8   a summary witness in this case, based upon his experience, a

9   registered professional engineer in fire protection -- and

10  that's the other interesting thing in this case when you think

11  about it.  The danger of gas-fired furnaces is not only carbon

12  monoxide but also something that is even worse in an apartment

13  such as this.  I have watched one of these buildings go up in

14  flames, and believe me, it is an explosive experience to see

15  it.  They burn very well and leave virtually nothing once the

16  fire is out and present a heck of a problem to fire and rescue

17  services, but that's just me talking.  But there is the other

18  possibility of fire and explosion with a gas-fired appliances.

19  So there are very good reasons for inspection.

20         The argument is there's no knowledge of a defect.

21  Well, I don't think -- it seems to me it's an ostrich defense,

22  can we put our head in the sand and ignore the fact that we

23  have access to these apartments on a frequent basis, that we

24  are conducting a semiannual inspection, that we are claiming

25  to change the furnace filters on a regular basis, and yet we

7

 1   have trained no one to know anything about these potentially

 2   hazardous devices and, as pointed out by Mr. Slifka, that the

 3   residential property ties back to the standards adopted by the

 4   City of Casper later on and which were admittedly different

 5   than when these furnaces were originally installed in the

 6   apartment, industry standard of minimum annual inspection of

 7   units.  That's not a -- I don't think calls for a -- something

 8   conducted under amateur hour.  And, you know, here Sunridge

 9   was aware, AMC presumably was, that these furnaces

10   represented, you know, as a professional management company,

11   represented an old technology, and in view of the issues that

12   existed after 2009 that anyone who had knowledge would

13   indicate there was a need for safety inspection as well as

14   servicing.  Mr. Haid certainly repeatedly reinforced that.

15   And we have injury occurring as a result of other poisonings

16   and problems that led to medical treatment.  We have had

17   furnaces being red-tagged and a host of problems calling

18   Mr. Haid to the premises to provide maintenance.  So I think

19   there's evidence anyway that would suggest that there was

20   ample warning of a potentially dangerous condition.  And I

21   suspect that AMC in its, its activities promotes itself as a

22   manager who takes into account and advertises its expertise

23   in, in apartment management.

24           Statutorily the landlord is prohibited from renting

25   an unsafe premises and must exercise reasonable care under the

Julie H. Thomas, RMR, CRR                        (307)778-0078

**8**

1   circumstances.  Admittedly there is no one thing here that

2   speaks to that in terms of the evidence, but it is a fair jury

3   question, in the mind of the Court, that is presented in this

4   case for the jury to consider.

5           I agree with Mr. Ulmer, the issue of punitive damages

6   is not a separate cause of action, it is an element of proof,

7   and I will defer ruling at this time until I have heard all of

8   the evidence in the case.

9           Well, gentlemen, I will see you Monday morning.

10  Hopefully we'll have a set of instructions for you that you

11  can all begin to tear your hair over, but I'll be honest, why

12  would I not, in this case I'm not seeing anything unusual in

13  the instructions that are going to be given.  I think the

14  verdict form is going to be something that is important at

15  least in giving the jury the opportunity to reflect what its

16  verdict will be in this case and what its findings are at the

17  end of the case, and so we may be spending a little more time.

18  I notice I have received instructions, for example, on issues

19  of assumption of the risk, which I think is absorbed now in

20  the comparative fault statute.  There will be some questions

21  about actors who go on the verdict form.  I suspect some

22  discussion as to whether or not Miss Lompe goes on the verdict

23  form vis-à-vis any issues concerning a detector and her

24  decision to deep-six the one that she found on top of the

25  refrigerator.  Of course, there's no real evidence that she

Julie H. Thomas, RMR, CRR                         (307)778-0078

**9**

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF WYOMING

 3    ---------------------------------------------------------------

 4    AMBER NICOLE LOMPE,                  Case No. 12-CV-00088-J

 5           Plaintiff,                    Volume XII of XV
                                           (Pages 1937 through 2009)
 6           vs.                           Cheyenne, Wyoming
                                           December 17, 2013
 7    SUNRIDGE PARTNERS, LLC; and          9:14 a.m.
      APARTMENT MANAGEMENT
 8    CONSULTANTS, LLC,

 9           Defendants.                   ORIGINAL

10    ---------------------------------------------------------------

11

12                   TRANSCRIPT OF TRIAL PROCEEDINGS

13             BEFORE THE HONORABLE ALAN B. JOHNSON
                    UNITED STATES DISTRICT JUDGE
14                      and a jury of eight

15
      APPEARANCES:
16
      For the Plaintiff:      MR. G. BRYAN ULMER III
17                            MR. TYSON LOGAN
                              Attorneys at Law
18                            THE SPENCE LAW FIRM
                              P.O. Box 548
19                            Jackson, WY 83001-0548

20    For the Defendants:     MR. PETER S. DUSBABEK
                              Attorney at Law
21                            MONTGOMERY KOLODNY AMATUZIO & DUSBABEK
                              2625 Redwing Road, Suite 200
22                            Fort Collins, CO 80526

23

24

25            OFFICIAL COURT REPORTER - (307)778-0078

      Proceedings recorded by mechanical stenography,
      transcript produced by computer.
```

**10**

1   AMC and Sunridge, even if the statute were to extend that far,

2   which I don't contend it does, I think it does not, but even

3   if it did, this would not act as a complete assignment of all

4   duties because there's no explicit statement in here that a

5   duty to provide a safe and sanitary place fit for human

6   habitation has been assigned wholesale to AMC.

7           So aside from the statute not supporting the

8   argument, I think that the evidence does not support the

9   argument either, Your Honor.

10          THE COURT:  Thank you.

11          Well, I see it's noon, and we have a 12:30

12  sentencing.  I think I'll maybe take a look at this statute

13  between now and you could be back here by 1:30.

14      (Proceedings recessed 11:55 a.m. to 1:47 p.m.,

15      resuming outside the presence of the jury.)

16          THE COURT:  Thank you.  Please be seated.

17          I have conducted only brief research noting that the

18  Wyoming Statute is an adaptation of legislation that comes to

19  Wyoming from Utah with changes.  The Journal article that

20  discusses the Wyoming law was written by Arthur Gaudio, who

21  was the dean of the law school at the University of Wyoming

22  and whose entire background was that of property law and who

23  continues to write extensively about it and did, in fact,

24  discuss subparagraph (d) to the statute and concluded,

25  contrary to the defense argument, that this represented a

1    negotiating point between the renter, the tenant, and the

2    landlord, and it existed because the law itself changed what

3    the prior law was in the relationship between the landlord and

4    tenant.  Nevertheless, Gaudio had concerns.  And I will read

5    two paragraphs that are kind of long but that deal with this

6    area.

7              "For societal, economic, and technological reasons,

8              today's residential real estate market is not what

9              it was when landlord tenant law had its origins in

10             the common law.  Nor is that market the same as it

11             was only a hundred years ago.  Today, our economy

12             can support a safe and sanitary home for all of its

13             citizens.  Our definition of a habitable residence

14             today is one that has heat, electricity, plumbing,

15             and hot and cold running water.  The Residential

16             Rental Property Act created an implied warranty

17             stating precisely that.  However, it also created

18             the distinct possibility that those reasonable

19             amenities can be taken away.  It allows the

20             landlord to disclaim responsibility for them.

21             Given the oligopolistic nature of the residential

22             rental market, there is usually an imbalance in

23             bargaining postures between the prospective tenant

24             and her landlord, especially in locales where there

25             is a shortage of housing.  If the landlord is

     1              allowed to force the tenant to waive her implied

     2              warranty in order to obtain housing, the implied

     3              warranty created by the Act is a myth.

     4                   "The Act currently has two provisions allowing

     5              the landlord to disclaim the implied warranty, one

     6              potentially more problematic than the other.  The

     7              first one allows the landlord to disclaim his

     8              responsibilities to provide heat, electricity,

     9              plumbing, and hot and cold running water if it is

    10              'otherwise agreed upon in writing by both parties.'

    11              The second provides that 'any duty or obligation in

    12              this article may be assigned to a different party

    13              or modified by explicit written agreement signed by

    14              the parties.'  The extent to which these provisions

    15              allow the landlord to avoid his duties under the

    16              implied warranty depends on how the courts

    17              interpret the disclaimer provisions.  If they allow

    18              the landlord to insert general disclaimers without

    19              any barter in that regard, the Act will lose

    20              viability and there will be no assurance that

    21              housing will be habitable.  However, if the courts

    22              insist that, in order to waive the warranty, the

    23              tenant's attention must be drawn to a specific

    24              defect, that she will have the opportunity to

    25              evaluate that defect, and that there is

```
 1              consideration for the tenant's waiver, the Act will

 2              have teeth.  Indeed, that seems to be the intent of

 3              the second disclaimer provision -- the wording of

 4              the disclaimer must be 'explicit.'"  Written

 5              document.  "The legislature can also help to repair

 6              this potential hole in the effectiveness of the Act

 7              by amending it to clarify the meaning of 'explicit'

 8              and by removing the first waiver provision, which

 9              is really unnecessary given the existence of"

10              subparagraph (d) or "the second one," as Gaudio

11              states.

12              It just seems to me to make sense that it would be

13      far removed from the intent of the Wyoming Residential Rental

14      Property Act to interpret this otherwise to allow the landlord

15      or the owner to avoid responsibility or liability by

16      contracting with a third, third party.  Just in passing, I

17      note that the law is not opposite in Colorado, for example,

18      that has adopted a law in the case of Jules versus Embassy

19      Properties, 905 P.2d at 13.  However, there the injury

20      occurred to a third person coming onto the property as a

21      result of snow removal that either wasn't done or was done

22      poorly, and this occurred in the common areas which remained

23      under control of the property owner.  So the case doesn't

24      track as well as it otherwise -- as one would hope, and I'm

25      not relying upon that case in my decision.
```

1          Although well argued by the defendant, the second

2    argument is the lack of opportunity to discover the blocked

3    vent.  And as indicated by Mr. Cuzzillo and really by Romig,

4    who arrived on the scene in 2013, that the physical evidence

5    is now lost, and certainly no one can know which of the myriad

6    of problems, both real because they were testified to by

7    Mr. Coryell and Mr. Haid but were not further revealed or

8    available by a physical inspection by the experts Cuzzillo and

9    Romig.  So we don't know the precise mechanism that resulted

10   in what was observed by Mr. Coryell, and that is warm moist

11   CO-laden air or gas being emitted through the diverter vent

12   and possibly elsewhere.  As pointed out by Dr. Romig, it could

13   have even gone lower in the furnace.

14          Nevertheless, as all the experts have indicated in

15   this matter, a program of inspection and remediation by

16   persons who are qualified to do so would have substantially

17   reduced the likelihood of injury by the plaintiff and this

18   precise kind of injury, and also, as a final fallback, the

19   presence of a working carbon monoxide detector could have,

20   could have if it was working, provided a final solution that

21   would have at least allowed her to inquire further and

22   possibly leave and escape the condition.  Difficult to say

23   what she might have done.  She might have just unplugged the

24   buzzing device and gone back to bed.  We just don't know.  But

25   assuming she reacted appropriately to the alarm and left the

1   premises, we wouldn't be here.

2           As to the issue of punitive damages, I'll allow that

3   evidence to go to the jury, and we'll see what the jury says.

4   I recognize that that evidence for a disfavored form of relief

5   is, is weak, and I say it's weak because, because it is a

6   failure to act rather than an act done in a negligent way.  It

7   is further an act that, as alleged in this matter, it is an

8   act that smacks highly of inattention on the part of the

9   defendants in this case as well as ignorance, if I accept the

10  statement of -- the testimony of Miss Brooks, the regional

11  manager who persists in calling the poisonous gas $CO_2$ and

12  doesn't seem to have a grasp as to the danger.

13          All right.  Let's focus on instructions.  We'd like

14  to go back to the conference room and get to work, or would

15  you prefer to work here?  Either way.

16          MR. DUSBABEK:  May I inquire about one thing?

17          THE COURT:  Yes.

18          MR. DUSBABEK:  Given the comments of the Court about

19  the intent of the Act and subparagraph (d) being modification

20  of the, I think, the contractual relationship between tenant

21  and landlord, it seems to me that the lease should go in

22  evidence in its entirety given that interpretation.  And I

23  thought I'd open that up as long as we're on the subject, Your

24  Honor, because there is some limiting language in the lease,

25  some language that puts some burden on the tenant.  Mr. Ulmer

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF WYOMING

 3   ------------------------------------------------------------

 4   AMBER NICOLE LOMPE,                  Case No. 12-CV-00088-J

 5          Plaintiff,                    Volume XIII of XV
                                          (Pages 2010 through 2170)
 6          vs.                           Cheyenne, Wyoming
                                          December 18, 2013
 7   SUNRIDGE PARTNERS, LLC; and          9:34 a.m.
     APARTMENT MANAGEMENT
 8   CONSULTANTS, LLC,

 9          Defendants.                   ORIGINAL

10   ------------------------------------------------------------

11

12                 TRANSCRIPT OF TRIAL PROCEEDINGS

13             BEFORE THE HONORABLE ALAN B. JOHNSON
                   UNITED STATES DISTRICT JUDGE
14                      and a jury of eight

15
     APPEARANCES:
16
     For the Plaintiff:      MR. G. BRYAN ULMER III
17                           MR. TYSON LOGAN
                             Attorneys at Law
18                           THE SPENCE LAW FIRM
                             P.O. Box 548
19                           Jackson, WY 83001-0548

20   For the Defendants:     MR. PETER S. DUSBABEK
                             Attorney at Law
21                           MONTGOMERY KOLODNY AMATUZIO & DUSBABEK
                             2625 Redwing Road, Suite 200
22                           Fort Collins, CO 80526

23

24

25            OFFICIAL COURT REPORTER - (307)778-0078

     Proceedings recorded by mechanical stenography,
     transcript produced by computer.
```

**17**

1  confusing, and the instructions already in the packet are

2  appropriate.

3          MR. JONES:  The next one, Your Honor, is defendants'

4  Jury Instruction No. 11.  And I note that while we oppose any

5  instructions related to punitive damages or that matter going

6  to the jury, we simply state that if and since a jury

7  instruction is going, that Jury Instruction 11 should also

8  accompany it.  The defendants' Jury Instruction No. 11

9  provides that:  Willful and wanton misconduct has been defined

10 as that which tends to take on the aspect of highly

11 unreasonable conduct or an extreme departure from ordinary

12 care in a situation where a high degree of danger is apparent.

13          This is taken from Danculovich v Brown, 593 P.2d 187

14 at 191, Wyoming 1979.  We believe that this jury instruction

15 would adequately define in better terms what willful and

16 wanton conduct is and would help the jury reach the decision

17 on whether or not punitive damages should actually be awarded.

18          THE COURT:  I will refuse it.  I find that the

19 language of 42 generally, Instruction 42, covers that area.

20          MR. JONES:  Your Honor, the next jury instruction is

21 defendants' Jury Instruction No. 12.  For the same reasons and

22 issues I just discussed with No. 11, I believe they apply

23 equally to 12.  12 provides that:  The aggravating factor

24 which distinguishes willful misconduct from ordinary

25 negligence is the actor's state of mind.  In order to prove

1  that an actor has engaged in willful misconduct, one must

2  demonstrate that he acted with a state of mind that approaches

3  intent to do harm.

4          This is a quote taken from Cramer v Powder River

5  Coal, 2009 Wyoming 45, Wyoming 2009.

6          THE COURT:  Refused.

7          MR. JONES:  The next one, Your Honor, is defendants'

8  Jury Instruction No. 13.  It relates to the affirmative

9  defense of assumption, assumption of the risk.  13 provides

10 that:  The affirmative defense of the comparative negligence

11 of plaintiff is proved if you find all of the following:  1,

12 the plaintiff was negligent; and, 2, the negligence of the

13 plaintiff was a cause of the plaintiff's own claimed injuries,

14 damages, or losses.  You may find that plaintiff was negligent

15 if you find that she assumed a risk of harm.

16          This is based on Brittain versus Booth, 601 P.2d 532,

17 Wyoming 1979.  Therein the Wyoming Supreme Court noted that

18 assumption of risk is a form of contributory negligence, but

19 it's not an absolute defense to a negligent action, but it is

20 a basis for apportionment of fault.  Thus, while we are

21 cognizant that comparative fault principles apply, we believe

22 that Brittain v Booth supports the position that assumption of

23 the risk is a consideration for comparative fault and that

24 defendants' Jury Instruction 13 should be submitted.

25          THE COURT:  It will be refused.


Julie H. Thomas, RMR, CRR                        (307)778-0078

**19**

Appellate Case: 14-8082   Document: 01019413920   Date Filed: 04/10/2015   Page: 91

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

U.S. DISTRICT COURT
DISTRICT OF WYOMING

2013 DEC 26   PM 4 42

STEPHAN HARRIS, CLERK
CHEYENNE

AMBER NICOLE LOMPE,

    Plaintiff,

    vs.                             Case No. 12-CV-88-J

SUNRIDGE PARTNERS, LLC, and
APARTMENT MANAGEMENT
CONSULTANTS, LLC,

    Defendants.

# JUDGMENT

    This action came on for trial before the Court and a jury, Honorable Alan B. Johnson, District Judge, presiding.  The issues having been tried and the jury having duly rendered its verdicts, finding that plaintiff Amber Nicole Lompe is entitled to recover compensatory and punitive damages, it is hereby

    **ORDERED, ADJUDGED AND DECREED** that plaintiff, Amber Nicole Lompe, recover compensatory damages of the defendant, Sunridge Partners, LLC, in the sum of $750,000.00, plus punitive damages in sum of $3,000,000.00, plus post-judgment interest thereon at the statutory rate of 0.14%, from the date of entry of this judgment, pursuant to 28 U.S.C. § 1961. **It is further**

1

20

Appellate Case: 14-8082    Document: 01019413920    Date Filed: 04/10/2015    Page: 92

**ORDERED, ADJUDGED AND DECREED** that plaintiff, Amber Nicole Lompe, recover compensatory damages of the defendant, Apartment Management Consultants, LLC in the sum of $1,950,000.00, and punitive damages in the sum of $22,500,000.00, plus post-judgment interest thereon at the statutory rate of 0.14%, from the date of entry of this judgment, pursuant to 28 U.S.C. § 1961.  **It is further**

**ORDERED, ADJUDGED AND DECREED** that plaintiff, Amber Nicole Lompe, recover her costs, pursuant to Fed. R. Civ. P. 54(d)(1), upon the filing of a bill of costs with the Clerk of the Court within ten (10) days of the date of entry of this Judgment, with the parties to bear their own attorneys' fees.

Dated this _26th_ day of December 2013.

ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE

21

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF WYOMING**

AMBER NICOLE LOMPE,

   Plaintiff,

   vs.                                        Case No. 12-CV-88-J

SUNRIDGE PARTNERS, LLC, and
APARTMENT MANAGEMENT
CONSULTANTS, LLC,

   Defendants.

## OORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW, OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL OR REMITTITUR

The defendants' renewed motion for judgment as a matter of law, or in the alternative, motion for new trial or remittitur (Doc. No. 175), and the plaintiff's response in opposition (Doc. No. 193) came before the Court for hearing on May 23, 2014. The Court, having reviewed the parties' submissions and all materials in the record, having considered counsel's arguments at the hearing, the applicable law, and being fully advised, hereby FINDS and ORDERS as follows:

### Background and Contentions

This was a personal injury action arising out of an event in which plaintiff Amber Lompe ("Lompe") suffered carbon monoxide poisoning in her apartment, which was owned and run by the defendants. The case was tried to a jury over a period of several weeks. On December 19, 2014, the jury entered its verdict in favor of plaintiff Lompe. The jury found defendant Sunridge Partners, LLC (Sunridge) to be 25% at fault, defendant

22

Apartment Management Consultants, LLC (AMC) to be 65% at fault, and plaintiff Lompe to be 10% at fault.  It went on to find that Lompe was entitled to recover damages in the amount of $3,000,000.00.  The jury's verdict also included findings that the conduct of both Sunridge Partners, LLC and Apartment Management Consultants, LLC constituted willful and wanton misconduct, such that punitive damages should be awarded against each defendant.

The second phase of the trial addressed punitive damages.  After hearing evidence and argument, and being instructed on the law, the jury found that punitive damages should be awarded.  They found $3,000,000.00 punitive damages should be assessed against Sunridge and that $22,500,000.00 should be assessed against AMC.

In this motion, the defendants collectively argue this "unprecedented" verdict was the "culmination of a series of errors and omissions by the Court as to jury instructions and evidentiary rulings, the sole cure for which is the grant of a new trial pursuant to Fed. R. Civ. P. 59."  They challenge the plaintiff's evidence and argue that punitive damages should have never been submitted to the jury.  The verdict is characterized as a runaway verdict.

The following is a brief summary of the defendants' claims.  They contend that, as to liability, the jury instructions given to the jury improperly increased their duty of care under Wyoming law, and simultaneously reduced or eliminated plaintiff's duties entirely. They claim the jury should have been instructed that a landlord must have notice of a defect before liability could attach and no such notice was provided to the defendants of the blocked flue vent that resulted in the carbon monoxide incident in this case. They claim the jury should have been instructed as to intervening cause and that the landowner may

2

assign its duties under the Wyoming Residential Property Act (WRPA). They contend that the plaintiff's actions, as they characterize them, in choosing to disable the carbon monoxide detector was not just comparative fault, but an assumption of risk, which led to an insufficient allocation of fault to plaintiff. They further argue that the Court instructed as to spoliation without making the required findings. The defendants assert various evidentiary errors stacked the deck against them. The jury did not hear that plaintiff had agreed to limit defendants' liability in the lease and that she failed to maintain the detectors in her apartment, and that had she done so, she would have prevented her own injuries.

As to punitive damages, defendants argue the evidence was insufficient, in that more than mere mistake, thoughtlessness, inadvertence, inattention or gross negligence is required. The instructions on punitive damages were not adequate in the defendants' view, where, defendants contend, they acted reasonably in hiring an experienced property manager, serviced furnaces as needed by hiring an HVAC professional, provided tenants with carbon monoxide detectors, broke no law, and violated no industry custom. The punitive damages award was grossly excessive and arbitrary and violated the due process clause of the Fourteenth Amendment.

It comes as no surprise that plaintiff disagrees entirely with the defendants' assertions and arguments. Plaintiff contends the instructions accurately stated defendants' duty of care, not increasing the duty, but defining the duty. It is an accurate statement of Wyoming law. The defendants' efforts to rely on common law landlord duties and immunities by asking for a "knew or should have known of the danger" standard is contrary to Wyoming law. The Wyoming Supreme Court held in *Merrill v. Jansma*, 86 P.3d 270,

3

24

287 (Wyo. 2004), that the WRPA abrogated common law and "establishe[d] a new standard of conduct in cases involving personal injuries occurring on rental property -- a standard of reasonable care under the circumstances." *Id.*  Plaintiff argues that none of the instructions rendered defendants insurers of tenant safety.  In sum, the instructions taken as a whole were correct and gave proper guidance to the jury.

Plaintiff asserts the instructions properly defined the plaintiff's duty of care, that no notice of defect instruction was appropriate, that no intervening cause instruction was necessary or appropriate, that Sunridge did not assign its duties under Wyoming law, and an assumption of risk instruction was unnecessary.  The failure to produce evidence instruction was appropriate, fair, proper, not a sanction and applied equally to both sides.  The instruction was not a spoliation sanction.  The defendants cannot show prejudice as they requested an adverse inference instruction and ultimately, may have benefitted from the instruction given.

Plaintiff asserts no errors in evidence require a new trial.  The Court did not err by redacting the "limited liability" clause of the lease; the redaction omitted confusing and improper portions of the lease that would have created jury confusion.  Further, the plaintiff asserts that the prohibition of lease term interpretation and argument by counsel was appropriate, in that paragraph 28 of the lease relating to smoke detectors had no bearing in the case.

The opinion claiming to establish a local standard of care was properly excluded.  The Court properly prohibited expert opinion from Peter Meer from testifying about a locality standard of care when that matter has been addressed by statute.  Post-incident

4

25

evidence that the carbon monoxide alarm provided in her apartment when she moved out was broken was offered to rebut the argument that Lompe was negligent or that she was ever provided a functioning carbon monoxide alarm. Plaintiff contends evidence, including semi-annual inspection reports, disclosed missing carbon monoxide alarms in many units, and that weeks after Lompe was poisoned, the majority of apartments did not have functioning alarms, nothing had changed, and the defendants did not have a practice in place to provide functioning alarms or carbon monoxide detectors to tenants. These were not remedial measures precluded from being admitted into evidence by Fed. R. Evid. 407.

After Mike Few, the on-site manager was poisoned by carbon monoxide, a SourceGas employee told AMC employee Mesenbrink that it should have its furnaces inspected. The defendants objected to this evidence as hearsay; plaintiffs clarified it was being offered to prove that defendants had notice the furnaces needed to be inspected, not that they actually needed to be inspected. The statement was initially excluded, but later allowed through Lompe's safety expert, Slifka. The statement was not offered to prove the truth of the matter asserted and was proper.

Plaintiff's experts testified in accordance with their qualifications and designations, including Dr. Weaver, who testified regarding his clinical interpretations of MRI and fMRI imaging, information he relied on when evaluating Lompe. Likewise, he also relied on data compiled by others, including Dr. Orrison, who performed the MRI and fMRIs of Lompe. Orrison's statements to Weaver were indeed hearsay, but admissible because their probative value in aiding the jury to understand Weaver's opinion was substantially outweighed any prejudicial effect. Fed. R. Evid. 703.   The plaintiff argues the Court did not

abuse its discretion by allowing testimony outside the scope of the experts' Rule 26 designations, including the testimony of Drs. Holmberg, Foley, and Helffenstein and economist Randle.

As to punitive damages, plaintiff argues the matter was properly submitted to the jury and there was a sufficient evidentiary basis from which it could find the defendants acted willfully and wantonly, in accordance with Wyoming law. Before denying the defendants' renewed motion for a directed verdict on punitive damages, the Court considered all the evidence and found it should be a question for the jury to decide. Instructions given on punitive damages accurately stated the law; there was no violation of due process rights by allowing the defendants' financial conditions to be considered. Plaintiff characterizes the defendants' conduct as reprehensible and especially egregious, justifying consideration of the punitive damages and amount of any award by the jury.

## Judgment as a Matter of Law

The Tenth Circuit outlined the applicable standard for granting a judgment as a matter of law in *Jones v. United States Parcel Service, Inc.*, 674 F.3d 1187, 1195 (10th Cir. 2012):

> We review de novo the district court's denial of a motion for judgment as a matter of law. *Cummings v. Gen. Motors Corp.*, 365 F.3d 944, 949 (10th Cir. 2004). In diversity cases, "the substantive law of the forum state governs the analysis of the underlying claims, including specification of the applicable standards of proof, but federal law controls the ultimate, procedural question whether [judgment as a matter of law] is appropriate." *Wagner v. Live Nation Motor Sports, Inc.*, 586 F.3d 1237, 1244 (10th Cir. 2009) (internal quotation marks omitted). Under federal law, "[a] party is entitled to judgment as a matter of law only if all of the evidence, viewed in the light most favorable to the nonmoving party, reveals no legally sufficient evidentiary basis to find for

the nonmoving party." *Burrell v. Armijo*, 603 F.3d 825, 832 (10th Cir. 2010). Judgment as a matter of law "is warranted only if the evidence points but one way and is susceptible to no reasonable inferences to support the party opposing the motion." *Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1241 (10th Cir. 1999) (citation and quotation omitted).

See also *Spahr v. Ferber Resorts, LLC*, 419 Fed.Appx. 796, 800 (10th Cir. 2011).

The Court is not persuaded by the defendants' arguments that the instructions given to the jury were not in accordance with governing Wyoming law.

Instruction No. 19 stated:

Because the amount of care exercised by a reasonably prudent person varies in proportion to the danger known to be involved in what is being done, the amount of caution required in the use of ordinary care varies with the nature of what is being done and all the surrounding circumstances shown by the evidence in the case. To put it another way, any increase in foreseeable danger requires increased care.

This instruction is consistent with Wyoming law, as stated by the Wyoming Court in *Wyrulec Co. v. Schutt*, 866 P.2d 756, 762 (Wyo. 1993):

However, we believe the standard is correctly stated as ordinary or reasonable care but what constitutes ordinary care increases as the danger increases. The concept of ordinary care accommodates all circumstances so that the degree of care varies with the circumstances. Ordinary care which is "commensurate with the danger" does not impose a higher duty, "but more fully defines what is ordinary care under the facts presented." *Texas Utilities Elec. v. Gold Kist*, 817 S.W.2d 749, 753 (Tex.App. 1991). See also, *Rich Mountain Elec. Co-op., Inc. v. Revels*, 311 Ark. 1, 841 S.W.2d 151, 153 (1992) (electric companies must exercise ordinary care); and *Rogers v. Grunden*, 589 N.E.2d 248, 256 (Ind.App. 1992) (although some states require utmost care, we require ordinary care under like conditions and circumstances).

Defendants tendered Instruction No. 7, No. 8, No. 9, and No.10. These instructions were rejected with the Court finding them to be redundant. The proposed instructions added little to Instruction No. 19 advising the jury of the standard of care.

The Wyoming Supreme Court discussed the standard of care established when the

Wyoming Residential Property Act, Wyo. Stat. § 1-21-1201 *et seq.*, was enacted by the

legislature.  In *Merrill v. Jansma*, 86 P.3d 270, 287 (Wyo. 2004), it stated:

> We further hold that this legislatively created duty establishes a new standard of conduct for purposes of personal injuries occurring on rental property. As we said in *McClellan v. Tottenhoff*, 666 P.2d 408, 413 (Wyo. 1983), the duty of exercising care to protect another person may exist either at common law or be imposed by statute, and where legislation is silent as to whether it establishes a new standard of conduct for purposes of a tort action, it is up to the judiciary to decide whether it has that effect. Here, the statute imposed the duty, and we conclude that it likewise establishes a new standard of conduct in cases involving personal injuries occurring on rental property—a standard of reasonable care under all of the circumstances. In reaching this conclusion, we act to further the legislature's intent. Our holding is also influenced by the following comment:
>
> > If one can extricate himself from all the prevailing preconceptions concerning the nature of this problem, the most simple and obvious avenue to defining a landlord's tort liability respecting the condition of leased premises is to brush aside contracts, warranty, or statutory violations, and declare a rule of reasonable care, which includes the duty to respond reasonably to the need for action and to act reasonably in doing so.... In most states having new statutes that impose a similar general obligation on landlords, courts by construction could ... treat the statutes as enlarging a landlord's duty....
>
> *Browder*, supra, at 124.
>
> In concluding that the act does away with the common law rule and its exceptions and imposes a duty of reasonable care under the circumstances, we also point to the rule that we are to presume the legislature enacts statutes with full knowledge of existing law. *Parker*, 845 P.2d at 1044. We do not review statutes in isolation but rather construe them in relation to and in harmony with existing law and as part of a general and uniform system of jurisprudence. *Id*. Our legislature enacted the Residential Rental Property Act at a time when landlord-tenant law was undergoing massive changes nationwide. Numerous states had already enacted the URLTA. The vast majority of other states, either by legislation or by judicial decision, had adopted similar rules of law imposing a duty on landlords. We had expressly deferred similar action to our state legislature. Accordingly, we

presume the legislature enacted the Residential Rental Property Act with full knowledge of the law in Wyoming that, with only limited exceptions, a landlord historically had no duty to maintain rental premises. We also presume the legislature enacted the provision with full knowledge that the trend nationwide has been to replace the no-duty rule and impose a duty on landlords to keep rental property safe. We further presume the legislature promulgated the act with full knowledge that this Court declined to judicially change the common law rule on several occasions because in our view it was a matter for the legislature. Making these presumptions, and looking at the plain language used by the legislature, we do not find the act to be vague or uncertain or subject to varying interpretations. In providing that the owner of rental property and his agent have a duty to "maintain that unit in a safe and sanitary condition fit for human habitation," the legislature has spoken in unambiguous terms and we are bound to the results so expressed. *Albertson's*, ¶ 7. . . .

Here, the defendants' argument suggests the instructions attempt to define or broaden the standard of care and limit the jury's consideration of all evidence at trial in making its decision.  The defendants' proposed instructions are objectionable in that they are not accurate statements of law, they are argumentative, and add little to the instructions actually given.  Nothing precluded the defendants from making arguments during their closing arguments to persuade the jury that they did everything required by the WRPA with respect to inspection, maintenance, and repair of the rental property. Instruction No. 19 instructed the jury regarding the standard of care and noted that standard varied with the nature of what is being done and the circumstances shown by the evidence in the case.  The jury also was instructed on applicable statutory language in Instruction No. 27, No. 28, No. 29, and No. 30.

At trial, the Court refused defendants' proposed intervening cause instructions, No. 3 and No. 4.  The instructions given, No. 19A, No. 20, No. 21, and No. 34 provided guidance to the jury regarding cause.  Furthermore, the Court's instruction on comparative

negligence addressed these concerns, and required the jury to allocate fault for acts or omissions determined to be a cause of the injury. Fault includes and embraces, among other things, assumption of risk by a party. The recovery of damages is limited in accordance with the comparative fault statute. See e.g., Wyo. Stat. § 1-1-109. The jury considered all evidence during trial that was or was not presented and made its liability determinations for each of the parties in accordance with the evidence presented at trial and the Court's instructions. Defendants' Instruction No. 14 was refused for these same reasons.

Defendants' proposed Instruction No. 5 included a paragraph providing, "[a]ny duty or obligation in this article may be assigned to a different party or modified by explicit written agreement signed by the parties." Wyo. Stat. § 1-21-1202 addresses the duties of owners and renters:

> (a) Each owner and his agent renting or leasing a residential rental unit shall maintain that unit in a safe and sanitary condition fit for human habitation. Each residential rental unit shall have operational electrical, heating and plumbing, with hot and cold running water unless otherwise agreed upon in writing by both parties. Provided, however, this section shall not prevent the rental of seasonal rental units such as summer cabins which are not intended to have such amenities.

> (b) Each renter shall cooperate in maintaining his residential rental unit in accordance with this article.

> (c) This article does not apply to breakage, malfunctions or other conditions which do not materially affect the physical health or safety of the ordinary renter.

> (d) Any duty or obligation in this article may be assigned to a different party or modified by explicit written agreement signed by the parties.

The statute applies to assignments between landlords and tenants. It does not

govern any assignment between landlords and property managers. An extensive and

thoughtful analysis regarding shifting of responsibilities is included in an article written by

Arthur R. Gaudio, *Wyoming's Residential Rental Property Act -- A Critical Review*, 35 Land

& Water L. Rev. 455, 478 (2000). The author there stated:

> The more general of the two provisions in the Act allowing for a waiver of landlord's duties provides that "[a]ny duty or obligation in this article may be assigned to a different party or modified by explicit written agreement signed by the parties." [FN111] How should the word "explicit" be interpreted? Does "explicit" simply mean "written?" If so, all that the lease agreement would need to contain is a written provision stating that the warranty was waived. For example, a simple boilerplate provision stating that the tenant takes the premises "as is" or that the "tenant hereby waives all warranties" can negate the warranty. However, that interpretation seems doubtful and inappropriate for several reasons.

> First, if the word "explicit" merely meant "written," there would have been no need for the legislature to state that the waiver must be "explicit." The provision already states that the waiver must be written. All the provision would mean is the waiver must be by "written agreement." Obviously, that was not intended. Therefore, the word "explicit" must mean something more demanding.

> Second, the language of the section gives some idea of what the legislature was intending. Not only does the provision deal with modification of the landlord's duties, but also deals with assigning them to a different party. The only other party to whom the landlord's duties could be assigned is the tenant. This brings to mind situations in which the tenant, in consideration for a reduction in rent or some other benefit, is willing to accept that obligation and waive his rights under the Act. To be fair to basic contract concepts, however, that assignment should not be presumed unless the tenant knowingly accepts the assignment. As if to emphasize that fact, the provision requires the assignment or modification be made by "explicit" language. Any failure of the lease explicitly to identify the obligation being modified or assigned is not in compliance. Thus, any language of general disclaimer, acceptance of the premises "as is," or language that does not draw the attention of the tenant to the "explicit" defect involved is insufficient to meet the requirements of the statute.

> Justice Thomas, of the Wyoming Supreme Court, dissenting in a recent case, called attention to the same issue regarding a tort disclaimer in

a real estate contract:

> As a matter of public policy, disclaimers in contracts will not be honored unless the disclaimer is specific with respect to the tort disclaimed, and it is apparent that an express bargain was stuck to forgo the possibility of tort recovery in exchange for negotiated alternative economic damages .... The waiver of tort liability by the purchaser in such a contract is permitted, but only with knowledge and if bargained for in the exchange. [FN112]

Finally, given the fact that the legislature went to the effort of adopting an implied warranty, why would it allow a landlord to negate it so easily? Since we now have a statute imposing an implied warranty on the landlord, we no longer have a "bare table" on which there are no presumptions. [FN113] There is now a presumption of an implied warranty. A waiver should be permitted only if the policy reasons for adopting the warranty in the first place have not occurred in the particular landlord tenant situation.

Perhaps the most significant policy reason for treating residential leases differently than other leases and implying a warranty is that residential tenants usually are not in an equal bargaining position with their landlord and the implied warranty tends to even out the bargaining field. Thus, it would be appropriate to inquire whether the landlord and tenant were in a position of actual even-handed negotiations over the exclusion of the warranty. Was the tenant aware of the defect for which the landlord is disclaiming responsibility? Does the wording of the waiver draw the attention of the tenant to a specific defect, or is the defect a latent one? Was there consideration for the waiver? If the response to these questions is in the negative, it seems inappropriate to allow the landlord to disclaim his statutorily imposed duties.

This approach supports the basic purposes behind the adoption of the implied warranty. If landlords must disclose the precise defect that is being waived, the stock of habitable housing in the state will be enhanced. [FN114] If they have the choice, tenants will generally choose not to rent a defective apartment. Explicit disclosure should encourage the landlord to make the repair and, as a result, will improve the stock of habitable housing. In other words, the economics of the marketplace should encourage the maintenance and improvement to the stock of habitable dwellings in the state.

The other provision regarding waivers is less clear regarding the need for specific language. It provides that "[e]ach residential unit shall have electrical, heating and plumbing, with hot and cold running water unless

otherwise agreed upon in writing by both parties." [FN115]

The sentence begins by requiring certain amenities but allows one or more of them to be waived by an agreement in writing. Nevertheless, it does not allow a general waiver of the warranty itself; it only allows the waiver of specific amenities, if agreed to in writing. To be in compliance with the requirements of this section, the lease agreement must at least mention that the disclaimer involves electrical, heating, plumbing and/or hot and cold running water. If it purports to affect more than those specific amenities, it attempts to do more than the Act allows. Furthermore, this section does not allow general disclaimers or "as is" clauses. An "as is" clause affects, or potentially affects, more than the listed amenities.

Unlike the previously discussed provision, this section would appear to allow waiver of the listed types of amenities without specifying the explicit defect involved. For example, although this provision does not allow a waiver of all warranties, it may allow a waiver of "all warranties concerning heating of the leased premises." That disclaimer is not as explicit as is required by the prior provision. As so interpreted, it would allow landlords to insert boilerplate disclaimers mentioning the listed amenities. Landlords would be able to obviate most of the significant provisions of the Act simply by including such boilerplate disclaimers.

It is also interesting to note that such a loose interpretation of this provision would allow a disclaimer of the most central habitability elements by general language, while other habitability issues [FN116] which may not be so central, would need the explicit language required by the more general provision. [FN117] The courts could avoid this incongruity. They could interpret the requirements of the more demanding provision as controlling, since it is more specific.

Some examination of lease language as interpreted under both of these provisions might be helpful. Consider the following examples:

(1) "The tenant accepts the premises as is" or "the tenant waives all implied warranties as created by law." This language is not sufficiently specific to qualify for an explicit disclaimer, nor does it mention the specific amenities and, thus, does not qualify for the more general disclaimer. Furthermore, in neither case is the tenant's attention drawn to the defect involved. If the defect currently exists and is known to the landlord, he should not be allowed to absolve himself by failing to disclosing the defect. He would be laying a trap for a legally unsophisticated tenant.

13

34

(2) "The tenant waives all implied warranties to provide heat to the premises." In this case, there is a mention of the specific type of amenity being disclaimed and it is one of those listed in the statute, but there is no indication that the tenant was advised as to an "explicit" defect and allowed to evaluate it. [FN118] Nor is there is any indication that the tenant was given any consideration for the waiver. [FN119] This example does not qualify under the provision requiring explicit language in the waiver. However, it might qualify under the more general provision since it does mention the specific type of amenity being disclaimed.

(3) "The tenant hereby recognizes that the furnace in the house does not operate and in consideration for a reduction in the rent agrees to fix the furnace and supply her own heat." This reassignment of duties is explicit. It mentions not only the fact that it involves heat, but also clearly identifies the explicit defect. The tenant is given information that she can evaluate and upon which she can make a decision. She is also given consideration for accepting the assignment of the duties that would otherwise be placed on the landlord; thus, it qualifies under either provision.

(Footnotes omitted.)

This is a persuasive analysis and the Court finds that the language relied upon by the defendants' to shift the responsibility one to the other has no application here and even if it did, the lease did not include an explicit written waiver or assignment signed by Amber Lompe.

Instruction 47a given by the Court provided:

If a party fails to produce evidence under that party's control and reasonably available to that party and not reasonably available to the adverse party, then you may infer that the evidence is unfavorable to the party who could have produced it and did not.

This is instruction 104:26 in the pattern O'Malley, Grenig, and Lee Federal Practice and Instructions (Sixth Edition). The notes in O'Malley indicate that no inference can be drawn

from the failure to produce evidence not in a party's control, citing *Savard v. Marine Contracting Inc.,* 471 F.2d, 536, 541-542 (2d Cir. 1972), cert. denied, 412 U.S. 943, 93 S.Ct. 2778 (1973).

However, Instruction 47a was given in conjunction with Instruction No. 47:

> In considering the evidence, you are permitted to draw such reasonable inferences as seem justified in light of your experience. Inferences are deductions or conclusions which reason and common sense lead the jury to draw from facts established by the evidence. Any findings of fact you make, however, must be based on probabilities -- not possibilities. A finding of fact may not be based on surmise, speculation, guesswork or conjecture.

In another case, the Second Circuit determined that a missing evidence instruction in an employment case permitting the jury to draw reasonable inferences from missing evidence in favor of either parties' positions was not fundamental error, where the missing evidence was repeatedly referred to at trial, and the support it may have lent to the discrimination claims was speculative. The court stated:

> Undertaking that review, we conclude that even assuming Lewis was entitled to an adverse inference instruction based on CBP's failure to locate and introduce certain evidence at trial, the magistrate judge's charge was not so fundamentally flawed as to "deprive[ ] the jury of adequate legal guidance to reach a rational decision." *Id.* Rather, given Lewis's repeated reference to the missing evidence at trial and the speculative nature of the support it may have lent to his discrimination claims, the charge as given provided adequate guidance by permitting, but not requiring, the jury to draw reasonable inferences from the missing evidence in favor of either Lewis's or CBP's positions. Furthermore, the magistrate judge informed the jury that in determining "whether to draw any inferences, [it] should consider whether the evidence that was not produced would merely have been duplicative of other evidence" already in the record and whether the admitted evidence supports or refutes the inferences the jury is being asked to draw. In light of the circumstances of this case, we hold that the magistrate judge's missing evidence instruction did not constitute fundamental error; the instruction instead provided reasonable guidance to the jury as it worked to reach a verdict and make sense of testimony and arguments about documents not

admitted as evidence at trial.

*Lewis v. Napolitano*, 423 Fed.Appx. 43, **2 (2d Cir. 2011).

Defendants characterize Instruction 47a as punitive; plaintiff disagrees and then continues to offer a recitation of facts demonstrating bad faith that would support an explicit spoliation instruction. The given instruction applied to all parties. The instruction permitted the jury to consider all evidence and draw its own conclusions in reaching its verdict. Compare to this the more specific permissive adverse inference instruction given and upheld in *Mali v. Federal Ins. Co.*, 720 F.3d 387, 391 (2d Cir. 2013):

> In this case, evidence has been received which the Defendant contends shows that a photograph exists or existed of the upstairs of what had been referred to as the barn house, but no such photograph has been produced. If you find that the Defendant has proven by a preponderance of the evidence, one, that this photograph exists or existed, two, that the photograph was in the exclusive possession of the Plaintiffs, and, three, that the non-production of the photograph has not been satisfactorily explained, then you may infer, though you are not required to do so, that if the photograph had been produced in court, it would have been unfavorable to the Plaintiffs. You may give any such inference, whatever force or effect as you think is appropriate under all the facts and circumstances.

Defendants here cite *Henning v. Union Pacific Railroad Co.*, 530 F.3d 1206 (10th Cir. 2008) to argue Instruction 47a was improper and that a showing a bad faith was required before any adverse instruction could be given. *Henning* is distinguishable on its facts. However, the Tenth Circuit did state an adverse inference

> ...is a powerful sanction as it "brands one party as a bad actor" and "necessarily opens the door to a certain degree of speculation by the jury, which is admonished that it may infer the presence of damaging information in the unknown contents of an erased audiotape." *Morris v. Union Pac. R.R.*, 373 F.3d 896, 900–01 (8th Cir. 2004). Therefore, courts require evidence of intentional destruction or bad faith before a litigant is entitled to a spoliation instruction. *Aramburu v. The Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997)." 530 F.3d at 1219-1220.

16

37

The plaintiff there argued that a spoliation instruction was appropriate where audio tapes had been destroyed pursuant to company policy.  UPRR had sent immediately an audio tape it had thought to be the correct recording of the accident, but learned later the correct audio tape had been destroyed.  The plaintiff had provided no evidence showing the audio tapes contained any relevant evidence supporting the contention that new trial should have been granted.  Plaintiff had also failed to demonstrate prejudice.  The court noted that relevance is a highly fact-specific inquiry and that information in one case may be relevant but not in another and the court has the discretion to fashion an appropriate remedy depending on the culpability of the responsibility party and whether the evidence was relevant to proof of an issue at trial.

Here, the evidence was relevant.  The apartment manager, Few, took photographs of the apartment after Lompe was poisoned; photographs were never produced.  Few had changed documents, filled out various versions of incident reports with different dates and recitals, and other information had been altered or omitted on documents related to Lompe's apartment. This evidence was testified to by Few at trial.  This is not a case of mere theoretical prejudice to plaintiff caused by evidence that defendants did not produce.  This evidence was relevant.  In the Court's view, the failure to produce instruction, applicable to all parties, was appropriate in this case.

As to the various evidentiary errors defendants complain about, the Court finds they do not warrant a new trial.  The Court has already addressed the defendants' arguments regarding assignment of duties in the preceding portions of this Order and further discussion will not be offered.  As to the exclusions of paragraph 28 of the lease, this

section addresses smoke detectors and does not address carbon monoxide detectors.  It is not relevant.  Redaction of the exculpatory clause, if erroneous, was at most harmless error, when coupled with the jury's finding of willful and wanton conduct, a standard greater than that included in the exculpatory clause.  Exculpatory clauses in residential leases have been found void as contrary to public policy. See e.g., *Stanley v. Creighton Co.*, 911 P.2d 705, 709 (Colo.App. 1996) (relying on provisions of the Coilorado Premises Liability Act, Colo. Rev. Stat. § 13-21-115, stating the act "confirms that landowner negligence is an issue of public concern.")

As Professor Gaudio stated, residential leases have been more or less an orphan child in the Wyoming legal structure, perhaps with understandable social and economic reason. Arthur R. Gaudio, Wyoming's Residential Property Act--A Critical Review, 35 Land & Water L. Rev. 455-456.  The act addresses pressing issues presented by residential leases and a body of law devoid of tenant protections. *Id.* Public policy, as encompassed in the Wyoming Residential Property Act, is to provide a modicum of protection to residential lessees and identify specific statutory obligations that a landowner and his agent must satisfy and similarly, concerns landowner responsibilities as owed to renters and members of the public, and conversely, responsibilities of the tenant to the landowner and agent. *Merrill v. Jansma*, 86 P.3d 270 (Wyo. 2004) also recognized that the Wyoming Residential Property Act, and the Uniform Residential Landlord Tenant Act, replace the common law providing for landlord immunity and supplanting common law with clearly established statutory duties owed by the landlord to a tenant.

Defendants complain about the exclusion of Peter Meer.  The Court persists in its

prior determination excluding his testimony describing, interpreting or attempting to give legal opinions regarding the meaning of a contract.  While he was not permitted to testify about a "locality" standard of care which has been addressed by statute, the Court's ruling permitted him to testify about the differences between the roles of a property manager and a property owner.

Defendants' criticism of the Court's decision allowing admission of property inspection reports is not well taken.  The reports were allowed into evidence in order to demonstrate condition of the property at the time of the accident and to demonstrate a lack of contributory negligence.  Use of the reports was permitted to impeach defense witnesses pursuant to Fed. R. Evid. 407.  Post-accident reports were not remedial measures prohibited by Fed. R. Evid. 407.

Expert Slifka was permitted to testify regarding statements made by a Source Gas employee to AMC's employee Mesenbrink.  The statement was offered to prove notice, rather than the truth of the matter asserted, and thus, not hearsay.  A great deal of testimony during trial demonstrated the defendants were on notice of outdated furnaces in the complex that needed inspection, maintenance, repair or replacement.

Publication of images regarding MRI and fMRI images of Lompe's brain provided to Dr. Weaver by Dr. Orrison were not statements, were not hearsay, and were relevant evidence.  Dr. Weaver testified that clinicians rely on the type of data provided by specialists like Dr. Orrison when seeking to evaluate a particular patient.  The MRI and fMRI images were this type of data; they were independently interpreted by Dr. Weaver; the images were helpful to the jury in understanding Dr. Weaver's testimony and opinions.

Defendants were not prejudiced by testimony of the plaintiff's experts, including Drs. Holmberg, Foley, and Helffenstein, beyond the scope of Rule 26 disclosures, about the reasonableness and necessity of medical bills and care. There has not been a sufficient showing by defendants how they were prejudiced nor does the Court discern prejudice to the defendants, as the same evidence, even if it had been precluded, could have been offered by treating physicians. Furthermore, the defendants listed these physicians and did not call them.

As to the economist Randle who provided summaries of the defendants' financial data, there could be no prejudice to defendants as it was their own information, even if it was in summary form. They have not demonstrated prejudice by presentation of a summary rather than a full presentation of the raw underlying financial data, which had not been provided to plaintiffs until immediately before trial. The summaries were disclosed during trial and the defendants had an ample opportunity to pursue the issue through cross-examination and through presentation of their own defense.

Defendants complain that the punitive damages issue should not have been permitted to go to the jury ands that the jury was improperly instructed. The instruction given to the jury was an accurate instruction based on the Wyoming Civil Pattern Jury Instructions. The definition of wilful and wanton misconduct, although the defendants' main complaint seems to be that it was too short and simple, was an accurate statement of Wyoming law, as discussed in *Weaver v. Mitchell*, 715 P.2d 1361, 1370 (Wyo. 1986):

> Although degrees of negligence are not considered in comparative negligence, it must be remembered that the traditional concept of gross negligence visualized less culpable conduct than willful and wanton conduct. Gross negligence has been defined as:

> " * * * Indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons maybe be affected. It is a heedless and palpable violation of legal duty respecting the rights of others. The element of culpability which characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence. Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence. But it is something less than the willful, wanton and reckless conduct. * * * " *Altman v. Aronson*, 231 Mass. 588, 121 N.E. 505, 506, 4 A.L.R. 1185 (1919).

Willful and wanton misconduct is the intentional doing of an act, or an intentional failure to do an act, in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know that such conduct would, in a high degree of probability, result in harm to another. *Danculovich v. Brown,* supra.

See also *Cramer v. Powder River Coal, LLC*, 204 P.3d 974, 978 (Wyo. 2009).

The evidence in this case was sufficient to allow this matter to be considered by the jury following instruction according to Wyoming law. The jury's synthesis of all the testimony, evidence and exhibits received during the trial is not something readily capable of review. What weight they attributed to a witness's testimony, how they assessed credibility of witnesses, and their consideration of exhibits admitted is not something the Court or the parties can divine on the record of these proceedings. It was the jury's task to decide, based upon the evidence at trial, whether the defendants' conduct was willful and wanton. They did make such a finding, as reflected on the verdict form in the first phase of the trial. Once that finding had been made by the jury, the second phase allowed the jury to determine the amount of punitive damages to be awarded, following the instruction given by the Court providing guidelines for their decision. The instruction given was consistent with Wyoming Civil Pattern Jury Instruction 4.06A.

21

Punitive damages serve a broader function than that served by an award of compensatory damages. They are aimed at deterrence and retribution. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 123 S.Ct. 1513, 1519 (2003).    The Supreme Court has instructed courts reviewing punitive damages:

> . . . to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Id.*, at 575, 116 S.Ct. 1589. We reiterated the importance of these three guideposts in *Cooper Industries* and mandated appellate courts to conduct de novo review of a trial court's application of them to the jury's award. 532 U.S. 424, 121 S.Ct. 1678. Exacting appellate review ensures that an award of punitive damages is based upon an "'application of law, rather than a decisionmaker's caprice.'" *Id.*, at 436, 121 S.Ct. 1678 (quoting *Gore*, supra, at 587, 116 S.Ct. 1589 (BREYER, J., concurring)).

*Id.* at 1520.  The Court continued:

> "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S., at 575, 116 S.Ct. 1589. We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.*, at 576–577, 116 S.Ct. 1589. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. *Id.*, at 575, 116 S.Ct. 1589.

The Court finds that the evidence in this case does support a finding by the jury that punitive damages should be awarded.  The jury could easily find the defendants' conduct

22

reprehensible. The failure to address concerns with the furnaces, even in the face of prior carbon monoxide exposures to individuals other than Lompe, was a harm other than economic and the jury could properly determine the defendants' tortious conduct evinced an indifference to or reckless disregard of the health or safety of others. Plaintiff, and other tenants, did not possess equal bargaining power and could be viewed as financially vulnerable. This was not an isolated incident. The jury was instructed that the degree of reprehensibility of the defendant's conduct and the degree of the defendants' awareness of any hazard they caused or were likely to cause, concealment or coverup of the hazard, existence and frequency of similar past conduct were all relevant. They were instructed the harm that actually occurred should bear a reasonable relationship to the harm likely to occur from that conduct and the harm that actually occurred. They were instructed if the conduct was profitable to the defendant, punitive damages should remove the profit. The Court finds that the issue of punitive damages was properly submitted to the jury. They awarded plaintiff $3,000,000.00 compensatory damages; the punitive damage award as to defendant Sunridge Partners, LLC was $3,000,000.00; as to defendant Apartment Management Consultants, LLC, the punitive damages assessed by the jury were in the amount of $22,500,000.00. The amount of the punitive damages imposed in the case will be addressed in the next section of this order considering the defendants' request for a remittitur.

## Remittitur

In *Brown v. Skaggs-Albertson's Properties, Inc.*, 563 F.2d 983, 988 (10th Cir. 1977),

23

44

the circuit court stated:

> The remittitur procedure is a matter peculiarly within the discretion of the trial judge. *Walker v. Boulet*, 473 F.2d 1265 (9th Cir. 1973); *Kennair v. Mississippi Shipping Co.*, 197 F.2d 605 (2d Cir. 1952). For this court to order a remittitur at this eleventh hour in the proceedings would require a determination by us that the trial court had abused its discretion. In that connection, Oklahoma recognizes a broad jury discretion to determine the amount of damages for intangible injuries such as damage to reputation, humiliation, etc. The Oklahoma court has said that before a verdict of the jury will be set aside as excessive, it must appear that the verdict is so excessive as to "strike mankind, at first blush, as being beyond all measure unreasonable and outrageous and such as manifestly shows the jury to have been actuated by passion, partiality, prejudice or corruption." *Park v. Security Bank & Trust Co.*, 512 P.2d 113 (Okl.1973).

The Tenth Circuit Court has persisted in this analysis in *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 766 (10th Cir. 2009):

> We review the district court's denial of Kerr-McGee's motion for remittitur or a new trial due to excessive damages under a highly deferential standard, reversing only if we can discern a "manifest abuse of discretion." *Vining v. Enter. Fin. Group, Inc.*, 148 F.3d 1206, 1216 (10th Cir. 1998). Under this standard, the jury's award is inviolate unless we find it "so excessive that it shocks the judicial conscience and raises an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial." *Id.*

See also *Blanke v. Alexander*, 152 F.3d 1224, 1236 (10th Cir. 1998) ("'absent an award so excessive or inadequate as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the fact is considered inviolate.'")

Likewise, under Wyoming law, this type of analysis obtains. The Wyoming Supreme Court has articulated similar principles with respect to the granting of a remittitur in *Caterpillar Tractor Co. v. Donahue*, 674 P.2d 1276, 1289 (Wyo. 1983):

> The final issue we address is whether we should grant a remittitur as a condition of an affirmance. In *Cates v. Eddy*, Wyo. 669 P.2d 912 (1983), we stated: "If the verdict is so large or small that it shocks the judicial

24

45

conscience, the court has not only the right, but the duty, to grant remittitur or additur accordingly."

The Supreme Court has provided guidelines which should inform the decision here.

*State Farm Mut. Auto. Ins. Co. v. Campbell* reiterated that the Court has consistently rejected bright line ratios between compensatory and punitive damages awards. 123 S.Ct. at 1524.

> Turning to the second *Gore* guidepost, we have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. 517 U.S., at 582, 116 S.Ct. 1589 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award"); *TXO, supra,* at 458, 113 S.Ct. 2711. We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In *Haslip,* in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. 499 U.S., at 23–24, 111 S.Ct. 1032. We cited that 4–to–1 ratio again in *Gore.* 517 U.S., at 581, 116 S.Ct. 1589. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. Id., at 581, and n. 33, 116 S.Ct. 1589. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, *id.,* at 582, 116 S.Ct. 1589, or, in this case, of 145 to 1.

> Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where "a particularly egregious act has resulted in only a small amount of economic damages." *Ibid.;* see also *ibid.* (positing that a higher ratio might be necessary where "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine"). The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the

due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.

In sum, courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered. In the context of this case, we have no doubt that there is a presumption against an award that has a 145–to–1 ratio. The compensatory award in this case was substantial; the Campbells were awarded $1 million for a year and a half of emotional distress. This was complete compensation. The harm arose from a transaction in the economic realm, not from some physical assault or trauma; there were no physical injuries; and State Farm paid the excess verdict before the complaint was filed, so the Campbells suffered only minor economic injuries for the 18–month period in which State Farm refused to resolve the claim against them. The compensatory damages for the injury suffered here, moreover, likely were based on a component which was duplicated in the punitive award. Much of the distress was caused by the outrage and humiliation the Campbells suffered at the actions of their insurer; and it is a major role of punitive damages to condemn such conduct. Compensatory damages, however, already contain this punitive element. See Restatement (Second) of Torts § 908, Comment c, p. 466 (1977) ("In many cases in which compensatory damages include an amount for emotional distress, such as humiliation or indignation aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both").

The ratio here was 9-to-1 (considering the total punitive damages award for both defendants collectively). If the ratio is considered as to each defendant separately, for Sunridge Partners, LLC, it is 1-to-1. For Apartment Management Consultants, LLC, it is 7.5-to-1. This is within the realm of punitive damages that does not cross the constitutional line. The Court is also reminded trial by jury is the bedrock of our legal system. *Prager v. Campbell County Memorial Hosp.*, 731 F.3d 1046, 1061 (10th Cir. 2013). A court's authority to grant remittitur should be exercised with extreme reluctance to modify a jury verdict. *Id.* at 1061.

To be sure, a district court acts within its discretion in ordering a

remittitur of damages that are so grossly excessive as to shock the judicial conscience. [FN8 omitted] But, after careful consideration, we do not think this is such a case. "We review the trial court's decision regarding remittitur for an allegedly excessive damages award for an abuse of discretion." *Palmer v. City of Monticello*, 31 F.3d 1499, 1508 (10th Cir. 1994). A district court abuses its discretion in ordering a remittitur "when the size of the verdict turns upon conflicting evidence and the credibility of witnesses." *Id.* In a word, the jury's award is "inviolate." *Id.* And it remains inviolate "so long as it is not so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial." *Id.* (quotations omitted); see also *M.D. Mark, Inc. v. Kerr–McGee Corp.*, 565 F.3d 753, 766 (10th Cir. 2009) (same).

*Id.* at 1061-1062 (footnote omitted).

In this case, the Court hesitates to interfere with the jury's determination as to punitive damages. The harm here was not mere economic harm or injury. The injury was physical; if the plaintiff had been in her apartment even minutes longer, she likely would have lost consciousness and the carbon monoxide exposure could have disabled her for the rest of her life or could have been fatal. The potential for similar injuries to others was great where the defendants failed to correct known problems with furnaces in the apartment complex, exposing other tenants to carbon monoxide poisoning as well. The evidence of defendants' wealth was proper, if the goals of punishment and deterrence are to be facilitated. A defendant may be punished for malfeasance and conduct similar to that which harmed plaintiff. This is the only conduct that is relevant to the reprehensibility analysis. *State Farm*, 123 S.Ct. at 1524.

The Court here acknowledges that the award of punitive damages is significant and far greater than that usually seen in this district. In all probability, the Court likely has not made such a large award for punitive damages. But, it is not the Court's province to second-guess the jury's findings where the award is within constitutional bounds and does

27

48

not shock the judicial conscience.  It is unquestioned that the jury viewed the defendants'

conduct as egregious, warranting a greater award of punitive damages.  While surprising,

the award does not shock the judicial conscience nor is the Court compelled to conclude

that the jury's award should be upset, based on the facts and circumstances of the

defendants' conduct and the harm to the plaintiff and potential harm to others.  There is

no irresistible inference that passion, prejudice, corruption or other improper cause

invaded the trial. The Court will not belabor the matter further and will not grant the

request for a remittitur or new trial.

Accordingly, it is hereby

**ORDERED** that the defendants' renewed motion for judgment as a matter of law,

or in the alternative, motion for new trial or remittitur, shall be, and is, **DENIED.**

Dated this ___21st___ day of _____October_____ 2014.


_____
ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE

49

## Apartment Management Consultants LLC (AMC)
## Summary of Company Income and Partner's Shares of Income
## 2005-2012

### Summary of Company Income and Partner's Share of Income

| | 2005 | 2006[1] | 2007[2] | 2008[2] | 2009[2] | 2010[2] | 2011[2] | 2012[2] | Totals, 2005-2012 |
|---|---|---|---|---|---|---|---|---|---|
| Gross Receipts | $2,332,568 | $3,443,861 | $5,456,758 | $8,609,432 | $10,171,493 | $13,080,404 | $13,553,769 | $16,036,377 | $72,684,662 |
| Net Income | $805,840 | $812,429 | $1,431,901 | $2,809,467 | $2,896,766 | $4,365,874 | $3,992,011 | $5,745,854 | $22,860,142 |
| Net Operating Margin | 34.55% | 23.59% | 26.24% | 32.63% | 28.48% | 33.38% | 29.45% | 35.83% | 31.45% |
| Partner's Share of Income | $490,529 | $494,545 | $1,431,901 | $2,809,467 | $2,896,766 | $4,265,220 | $3,772,450 | $5,429,832 | $21,590,710 |
| Greg E. Wiseman | 157,590 | 158,942 | | | | | | | 316,532 |
| Howard Schmidt | 157,590 | 158,942 | | | | | | | 316,532 |
| David Schmidt | | | | | | | | | 318,118 |
| Heather Newport | | | | | | 50,327 | 109,780 | 158,011 | 318,118 |
| Brenda Barrett | | | | | | 50,327 | 109,780 | 158,011 | 318,118 |
| Sub-total Partner Income Shares | $805,709 | $812,429 | $1,431,901 | $2,809,467 | $2,896,766 | $4,365,874 | $3,992,010 | $5,745,854 | $22,860,010 |
| Additional Officer Compensation[3] | | | 169,849 | 207,684 | 199,992 | 223,070 | 537,211 | 350,002 | $1,687,808 |
| Total Partner Income | $805,709 | $812,429 | $1,601,750 | $3,017,151 | $3,096,758 | $4,588,944 | $4,529,221 | $6,095,856 | $24,547,818 |

### Summary of Company Capitalization, Return on Investment and Return on Equity

| | 2005 | 2006[1] | 2007[2] | 2008[2] | 2009[2] | 2010[2] | 2011[2] | 2012[2] | |
|---|---|---|---|---|---|---|---|---|---|
| Total Liabilities (debt)[4] | $47,453 | $38,201 | $440,299 | $499,737 | $1,748,867 | $333,794 | $130,519 | $182,140 | |
| Net Worth (partner's equity)[4] | 24,005 | 50,264 | 158,120 | 309,594 | 0 | 1,366,295 | 781,543 | 964,823 | |
| Total Invested Capital[4] | $71,458 | $88,465 | $598,419 | $809,331 | $1,748,867 | $1,700,089 | $912,062 | $1,146,963 | |
| Annual Rates of Return on Total Invested Capital (ROI) | 1128% | 918% | 239% | 347% | 166% | 257% | 438% | 501% | |
| Annual Rates of Return on Equity (ROE) | 3357% | 1616% | 906% | 907% | #DIV/0! | 320% | 511% | 596% | |

[1] Data extracted from U.S. Returns of Partnership Income (Form 1065) and and accompanying Schedules K-1 (Partner's Share of Income)

[2] Data extracted from U.S. Income Tax Returns for an S Corporation (Form 1120S) and and accompanying Schedules K-1 (Shareholder's Share of Income)

[3] Recipients are not identified.

[4] Data extracted from AMC annual financial statements, December 31,2005 - December 31, 2012

69

Sunridge Partners, LLC
Summary of Company Income and Partner's Shares of Income
2007-2012
(Apartment Building at 3900 East 12th Street, Casper, Wyoming)

### Summary of Partnership Reported Income[1] and Partnership Net Cash Flow

| | 2007[1] | 2008[1] | 2009[1] | 2010[1] | 2011[1] | 2012[2] | 2007-2012 Totals |
|---|---|---|---|---|---|---|---|
| 1. Gross Rents | $265,869 | $1,079,889 | $1,155,491 | $972,571 | $1,007,220 | $1,105,347 | $5,591,387 |
| 2. Operating Expenses, Including Depreciation[1] | 348,863 | 1,086,083 | 943,568 | 954,994 | 912,774 | 1,705,122 | 5,951,404 |
| 3. Net Rental Income (line 1 - line 2) | ($76,994) | ($6,194) | $211,923 | $17,577 | $94,446 | ($598,775) | (360,017) |
| 4. Plus Depreciation Expense | $178,272 | $316,967 | $226,521 | $171,278 | $168,533 | $127,049 | 1,188,620 |
| 5. Net Cash Flow (Line 3 + line 4) | $99,278 | $310,773 | $438,444 | $188,855 | $262,979 | ($471,726) | 828,603 |
| 6. Adjustment for writeoff of non-cash "reserve items" in 2012 other expenses[2] | | | | | | $294,412 | 1,594,741 |
| Adjusted 2012 net cash flow | | | | | | 766,138 | 766,138 |

**[1] Annual Operating Expenses**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| Insurance | $5,405 | $14,579 | $11,952 | $12,636 | $11,817 | $13,420 |
| Legal and Professional Fees | 1,422 | 9,412 | 2,420 | 47,938 | | |
| Interest | 69,733 | 273,080 | 268,400 | 263,399 | 258,056 | 252,390 |
| Repairs | 3,758 | 23,770 | 16,030 | 16,250 | 17,192 | 20,272 |
| Taxes | | 30,307 | 32,928 | 30,047 | 29,709 | 24,855 |
| Utilities | 15,483 | 70,748 | 76,884 | 84,923 | 90,289 | 94,040 |
| Wages and Salaries | 33,306 | | | | | |
| Depreciation | 178,272 | 316,967 | 226,521 | 171,278 | 168,533 | 127,049 |
| Other[2] (See statements to line 15 of annual returns) | 41,484 | 347,220 | 308,433 | 328,523 | 337,178 | 1,173,096 |
| Total Operating Expenses | $348,863 | $1,086,083 | $943,568 | $954,994 | $912,774 | $1,705,122 |

### Sunridge Partners, LLC Partners and Partnership Shares

| | Share | Share | Share | Share | Share | Share |
|---|---|---|---|---|---|---|
| Robert Chvrtlik | 48.00% | 48.00% | 48.00% | 48.00% | 50.00% | 50.00% |
| Jeff Chvrtlik | 48.00% | 48.00% | 48.00% | 48.00% | 50.00% | 50.00% |
| Margaret Marie Chvrtlik Trust | 4.00% | 4.00% | 4.00% | 4.00% | 0.00% | 0.00% |

[1] Data extracted from Sun Ridge Partners, LLC U.S. Returns of Partnership Income (Form 1065) and and accompanying Schedules K-1 (Partner's Share of Income)

[2] Other expenses of $1,173,096 for 2012 include an unexplained charge of $766,138 for creation of "reserve items." This expense is shown in Statement 4, Form 8825, Line 15, Other Expenses, and is an accounting entry that does not represent an actual cash expenditure.

70

51